UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

KORTRIGHT CAPITAL PARTNERS
LP, *et al*,

                    Plaintiffs,        16cv7619

        -against-        <u>OPINION & ORDER</u>

INVESTCORP INVESTMENT ADVISERS
LIMITED,

                    Defendant.

------------------------------------------------------------

WILLIAM H. PAULEY III, District Judge:

        Plaintiffs Kortright Capital Partners LP and its co-founders, Matthew Taylor and Ty Popplewell (collectively, "Kortright"), bring this action against Defendant Investcorp Investment Advisers Limited ("Investcorp") for negligent misrepresentation, negligence, breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. Investcorp moves to dismiss the Complaint. Investcorp's motion is granted in part and denied in part.

BACKGROUND

        The allegations in the Complaint are presumed to be true for purposes of this motion. Kortright Capital Partners was an SEC-registered investment adviser that managed capital for high net worth individuals and institutional investors. (Compl. ¶ 31.) In November 2013, Investcorp, another SEC-registered investment adviser, entered into a "Project Agreement" with Kortright. (Compl. ¶¶ 27, 35; Compl. Ex. A.) The Project Agreement required Investcorp to invest $50 million of its proprietary capital in Kortright for a minimum of two years. (Compl. ¶ 39.) At the start of the Project Agreement, Investcorp also invested $40 million of its clients'

1

capital in the Kortright funds. (Compl. ¶ 39.) The Project Agreement also contemplated that Investcorp would help market the Kortright funds. (Compl. ¶¶ 38, 42.)

In exchange for its seed capital and marketing assistance, Kortright granted Investcorp a share of its operating revenue (Compl. ¶ 46), veto power over certain corporate actions (Compl. ¶ 44), and access to Kortright's confidential information (Compl. ¶ 44, 48).

In January 2015, Man Group plc, an independent alternative asset management company and competitor of Investcorp, approached Kortright to discuss a possible acquisition of Kortright. (Compl. ¶¶ 55–57.) Their discussions spanned fourteen months and were not disclosed to Investcorp. Ultimately, Man Group and Kortright focused on either bringing the Kortright funds under the Man Group umbrella or winding down the Kortright funds and having Kortright's employees join the Man Group. (Compl. ¶ 58.)

In April 2016, Kortright disclosed to Investcorp that it had been exploring a new business relationship with Man Group. (Compl. ¶ 61.) Investcorp indicated its preference for an absorption of the Kortright funds into Man Group, provided that Investcorp was able to redeem its proprietary capital prior to the acquisition. (Compl. ¶ 63.) Investcorp proposed to leave its clients' capital with Kortright. (Compl. ¶ 63.) Kortright discussed with Investcorp "the length of time that such client capital would need to remain invested to satisfy [Kortright and the Man Group]" and the benefits Investcorp would receive "in return for maintaining its [clients' investment] for a period of time." (Compl. ¶ 63.) Following these discussions, Kortright outlined the basic terms of its new relationship with Investcorp in an email. (Compl. ¶ 64.) Specifically, (1) the Kortright funds would become part of the Man Group, (2) Investcorp would redeem its proprietary capital and permit its clients' capital to continue to be invested in Kortright, and (3) Investcorp would maintain at least 80% of its account balance at closing for

six quarters in order to continue to receive its revenue sharing benefits. (Compl. ¶ 64.) Subsequent conversations focused on the minimum investment threshold for Investcorp to maintain its revenue sharing benefits. (Compl. ¶ 64.)

Following those discussions with Investcorp, Kortright and Man Group structured their transaction to transfer the Kortright funds to the Man Group. (Compl. ¶ 65.) In May 2016, Investcorp withdrew its proprietary capital. (Compl. ¶ 118.)

On June 16, 2016, Kortright and the Man Group entered into their agreement ("the Man Transaction Agreement"). (Compl. ¶ 67.) Under the Man Transaction Agreement, the Man Group committed to invest at least $300 million of its clients' capital in Kortright funds, which would be managed by Taylor and Popplewell as employees of Man Group. (Compl. ¶¶ 67–68.) A condition of closing in the Man Transaction Agreement required Kortright to bring a minimum level of investment from Investcorp to the Man Group. (Compl. ¶¶ 70, 89.)

Simultaneously, Kortright and Investcorp entered into two new agreements: a "Termination Agreement" and a "Revenue Sharing Agreement." (Compl. ¶ 74; Compl. Exs. B and C.) The Termination Agreement ended the parties' relationship under the Project Agreement (Compl. ¶¶ 72–73; Compl. Ex. C), while the Revenue Sharing Agreement set new terms for the parties' relationship in view of the Man Transaction Agreement (Compl. ¶¶ 74–79; Compl. Ex. B). Under the Revenue Sharing Agreement, Investcorp would continue to receive revenue sharing benefits. (Compl. ¶ 74.) The Revenue Sharing Agreement also contained a termination provision in the event Investcorp redeemed capital in excess of a threshold amount. (Compl. ¶¶ 75–76.) Importantly, the Revenue Sharing Agreement did not set a fixed term for Investcorp to maintain its investment. (Compl. ¶¶ 74–79.)

The day after the Man Transaction Agreement was executed, Kortright notified its investors and sought consent to transfer their investments to the Man Group. (Compl. ¶ 83.) The letters to investors also indicated that Investcorp planned to continue its partnership with Kortright. (Compl. ¶ 83.) The Election Form included with the letters provided, among other things, that the investor was making an independent decision to invest in the fund and that the investor had all requisite power and authority to make the investment. (Compl. ¶ 85.)

Investcorp, as a client of Kortright, returned its consent forms within a week, and Kortright began to wind down its funds. (Compl. ¶¶ 84, 89.) However, two business days later, Investcorp revoked that consent on the basis that it was required to obtain its own clients' consents to the transfer of investments. (Compl. ¶¶ 86–88.) Because Investcorp's clients declined to consent, the client capital was subject to mandatory redemption. (Compl. ¶ 87.)

As a result, a condition of the Man Transaction Agreement was not satisfied and Man Group was relieved of its obligation to close the transaction. (Compl. ¶ 89.) Thereafter, the Man Group informed Kortright that it would not proceed with the Man Transaction or the employment of Taylor or Popplewell. (Compl. ¶ 90.)

## STANDARD

On a motion to dismiss, the factual allegations in a complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. Gonzalez v. Hasty, 802 F.3d 212, 219 (2d Cir. 2015). To withstand dismissal, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). On such motions, courts "may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any

4

document upon which the complaint heavily relies." ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir. 2014) (quoting In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013)).[1]

DISCUSSION

I. **Negligent Misrepresentation**

To state a claim for negligent misrepresentation under New York law, the Complaint must allege:

> (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 114 (2d Cir. 2012) (internal quotation marks omitted).

The Complaint alleges that Investcorp made multiple misrepresentations to Kortright indicating its willingness to allow its clients' investments in Kortright to be transferred to the Man Gorup. Specifically, the Complaint alleges that Investcorp (1) provided false election forms, regarding its clients' consent to the Man Transaction Agreement, (2) failed to disclose the need to obtain its clients' consent for the Man Transaction, (3) permitted Kortright to represent in its investor consent letters that Investcorp would remain invested with Kortright, (4) misrepresented that it supported the transfer of Kortright funds into the Man Group in April 2016, and (5) misrepresented its willingness to commit to the Man Transaction by signing the Revenue Sharing Agreement and Termination Agreement. (Compl. ¶ 100.) Kortright alleges it

---

[1] Because Kortright alleges only ordinary negligence, and not claims sounding in fraud, "there is no compelling reason to trigger Rule 9(b)." Woori Bank v. RBS Sec., Inc., 910 F. Supp. 2d 697, 705 (S.D.N.Y. 2012); In re Vivendi Universal, S.A., No. 02-CV-5571 (RJH), 2004 WL 876050, at *2 (S.D.N.Y. Apr. 22, 2004) ("[A]llegations of . . . negligent misrepresentation need only meet the standards of Rule 8(a).").

5

relied on these statements in winding down its business and proceeding with the Man Transaction Agreement. (Compl. ¶ 102.)

### a. Reliance and Foreseeability

"In assessing the reasonableness of a plaintiff's alleged reliance, [courts] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003). A plaintiff must also show that such reliance was to its detriment, i.e., "that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)." Meyercord v. Curry, 832 N.Y.S.2d 29, 30 (1st Dep't 2007). "Although reasonable reliance is a fact-specific inquiry generally considered inappropriate for determination on a motion to dismiss, whether a plaintiff has adequately pleaded justifiable reliance can be a proper subject for a motion to dismiss in certain circumstances." Glidepath Holding B.V. v. Spherion Corp., 590 F. Supp. 2d 435, 459 (S.D.N.Y. 2007).

In addition, "misstatements are actionable only if . . . plaintiffs' reliance upon the information [is] foreseeable." Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004). "There must be knowledge or its equivalent on the defendant's part that the information is desired for a serious purpose, that the plaintiff intends to rely and act upon it, and that if the information is false or erroneous, he will suffer injury." Eternity, 375 F.3d at 187. Such "issues of proximate cause are often fact-laden, requiring a fully developed factual record, and not a bare-bones motion to dismiss." Bank Midwest, N.A. v. Hypo Real Estate Capital Corp., No. 10-CV-232, 2010 WL 4449366, at *4 (S.D.N.Y. Oct. 13, 2010).

     *i.*  *Election Forms, Client Consent Letters, and Revenue Sharing Agreement*

    In entering into the Man Transaction Agreement, Kortright allegedly relied on Investcorp's election forms and its representation that Kortright could represent in its client consent letters that Investcorp would remain invested in the funds. (Compl. ¶¶ 100–02.) However, both of these alleged misrepresentations occurred <u>after</u> Kortright executed the Man Transaction Agreement, precluding Kortright's reliance on those statements.

    The Complaint also alleges that Kortright relied on the signed election forms to begin to wind down its business in anticipation of transitioning to the Man Group. (Compl. ¶¶ 2, 89.) However, the Complaint does not allege how Kortright was harmed in the two business days before Investcorp revoked its consent. Moreover, the Complaint states that Kortright had "already begun winding down operations in anticipation of closing the Man Transaction." (Compl. ¶ 89.) Thus, this misrepresentation, too, fails to adequately allege reasonable or detrimental reliance.

    The Complaint further alleges that Investcorp misrepresented its willingness to participate in the Man Transaction by signing the Termination Agreement and Revenue Sharing Agreement. But "[w]here the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation." <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 105 (2d Cir. 2007). This is particularly true "where . . . a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or <u>inserting appropriate language in the agreement for his protection</u>, he may truly be said to have willingly assumed the

7

business risk that the facts may not be as represented." Emergent, 343 F.3d at 195 (quoting Rodas v. Manitaras, 159 A.D.2d 341, 343 (1st Dep't 1990)).

Investcorp's involvement with the Man Transaction was documented in the Revenue Sharing Agreement, which preserved Investcorp's ability to receive a portion of revenues generated from Investcorp clients. But Kortright cannot claim reasonable reliance on the Termination Agreement or the Revenue Sharing Agreement because neither document committed Investcorp to maintaining its investment with Kortright. In fact, Kortright concedes that the Termination and Revenue Sharing Agreements do not contain misstatements themselves, instead arguing that the agreements reflect their reliance on Investcorp's April 2016 statements. (ECF No. 32 at 11 ("The Revenue Sharing Agreement itself is a product of Investcorp's false statements.").)

     *ii. April Statements and Investor Consent*

The Complaint alleges that prior to structuring the Man Transaction Agreement, Kortright presented both options to Investcorp. In ensuing discussions, Investcorp indicated its preference to proceed with the Man Transaction using only its clients' capital. (Compl. ¶ 63.) Kortright granted Investcorp the right to withdraw its proprietary capital in advance of executing the Man Transaction Agreement. The parties also discussed the financial benefits Investcorp would receive "in return for maintaining its investment for a period of time. (Compl. ¶ 63.) Whether it was foreseeable that Kortright would rely on Investcorp's representations concerning its willingness to continue its clients' investment in Kortright while omitting any reference to the need for client consent is a question of fact that cannot be resolved on a motion to dismiss.

b. Future Statements

Generally, courts guard against a party's "efforts to frame broken promises into misrepresentations of present fact." Murray v. Xerox Corp., 811 F.2d 118, 123–24 (2d Cir. 1987). "Promises of future conduct are not actionable as negligent misrepresentations." Murray, 811 F.2d at 122. "[T]he alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition." Hydro Inv'rs, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20–21 (2d Cir. 2000); Henneberry v. Sumitomo Corp. of Am., 532 F. Supp. 2d 523, 541 (S.D.N.Y. 2007) ("[Defendant's] promise of an initial investment in the future, that an investment 'would close,' and repeated statements that, should the need arise, it 'would be willing' to make additional investments in the future, . . . fail to support a claim of negligent misrepresentation as a matter of law because they solely speak to future conduct.").

Kortright alleges that Investcorp negligently represented its willingness to participate in the Man Transaction while failing to explain that the transfer of Investcorp's client capital was subject to client consent. However, those statements were made with a degree definitiveness that led both parties to take action. After the April 2016 discussions, Investcorp withdrew its proprietary capital in advance of the transfer of the Kortright funds to the Man Group (Compl. ¶ 118) and Kortright structured the Man Transaction Agreement based on Investcorp's representations (Compl. ¶ 65). Thus, construed in the light most favorable to Kortright, those statements reflected Investcorp's then-present intention to participate in the transfer of the Kortright funds to the Man Group—an intention on which both parties acted—not simply promises of future action.

9

c. Special Relationship

"[T]he standard of a special relationship in the context of a negligent misrepresentation claim is less rigorous than that of a fiduciary duty." Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A., 261 F.R.D. 13, 28 (S.D.N.Y. 2009), aff'd sub nom. Musalli Factory for Gold & Jewellry Co. v. JPMorgan Chase Bank, N.A., 382 F. App'x 107 (2d Cir. 2010). In determining whether a special relationship exists, the New York Court of Appeals has instructed courts to weigh three factors: (1) "whether the person making the representation held or appeared to hold unique or special expertise;" (2) "whether a special relationship of trust or confidence existed between the parties;" and (3) "whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." Kimmell v. Schaefer, 89 N.Y.2d 257, 264 (N.Y. 1996); see also Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 103 (2d Cir. 2001). "Courts in this circuit have held that a determination of whether a special relationship exists is highly fact-specific and generally not susceptible to resolution at the pleadings stage." Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 416 (S.D.N.Y. 2010) (quoting Century Pac., Inc. v. Hilton Hotels Corp., No. 03-CV-8258, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004)).

"A special relationship may be brought about by either privity of contract between the parties or a relationship so close as to approach that of privity." JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 400–01 (S.D.N.Y. 2004) (internal quotation marks omitted). "In the commercial context, a duty to speak with care exists when the relationship of the parties, arising out of contract or otherwise, is such that in morals and good conscience the one has the right to rely upon the other for information and the reliance is justifiable." Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC., 376 F. Supp. 2d 385, 411 (S.D.N.Y. 2005) (internal quotation

marks omitted).  But "the duty attendant to that special relationship 'must spring from circumstances extraneous to, and not constituting elements of the contract, although it may be connected with and dependent upon the contract.'"  JP Morgan, 350 F. Supp. 2d at 400–01 (quoting Clark-Fitzpatrick, Inc. v. Long Island RR Co., 70 N.Y.2d 382, 389 (N.Y. 1987)).  "In other words, '[i]f the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort.'"  JP Morgan, 350 F. Supp. 2d at 400–01 (quoting Hargrave v. Oki Nursery, Inc., 636 F.2d 897, 899 (2d Cir. 1980)).

Here, Kortright and Investcorp had "a closer degree of trust . . . than that of the ordinary buyer and seller."  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 788 (2d Cir. 2003).  Investcorp was Kortright's "self-proclaimed 'strategic partner'" and had special privileges, including the ability to veto numerous proposed actions by Kortright.  (Compl. ¶ 44–46, 97.)  In addition, Investcorp had access to "virtually any and all information regarding the Kortright funds" (Compl. ¶ 44) and held itself out as a "partner," offering "sales and marketing support."  (Compl. ¶¶ 34–35.)

Moreover, Kortright's negligent misrepresentation claim is tangential to the Project Agreement.  In JP Morgan, the agreement at issue required the defendant to provide certain assurances that banks would rely on to advance funds.  350 F. Supp. 2d at 401.  That court found that a special relationship was not adequately alleged because the plaintiff could not show that the special relationship was "in any way distinct from the defendants' obligations under the terms of the [agreement] itself."  JP Morgan, 350 F. Supp. 2d at 401.  By contrast, Investcorp's alleged misrepresentations did not breach the explicit terms of the Project Agreement; they contemplated a new relationship and termination of the Project Agreement.

11

Investcorp argues that "[w]here the parties do not create their own relationship of higher trust, courts should not fashion the stricter duty for them." Brinsights, LLC v. Charming Shoppes of Delaware, Inc., No. 06-CV-1745 (CM), 2008 WL 216969, at *8 (S.D.N.Y. Jan. 16, 2008). Investcorp claims that its relationship with Kortright was that of an "independent contractor." (Compl., Ex. A at 33.) But the contract provision Investcorp focuses on only provides that Investcorp did not have an equity interest in Kortright. Unlike the contract in Brinsights, it did not "disclaim[] any 'employment or trust relationship between the parties.'" 2008 WL 216969, at *8.

In addition, a special relationship may exist because Investcorp "held or appeared to hold unique or special expertise." Kimmell, 89 N.Y.2d at 264. While "[a] company's knowledge of the particulars of its own business is not the type of unique or specialized knowledge that the Court of Appeals was talking about," MBIA Ins. Co. v. GMAC Mortg. LLC, 914 N.Y.S.2d 604, 611 (Sup. Ct. N.Y. County 2010), these cases typically refer to more generalized, industry knowledge. Here, only Investcorp could have known whether consent from its clients was required. Because Plaintiffs could not have obtained that information from anyone else, it had to rely on Investcorp's specialized knowledge.

Accordingly, the motion to dismiss the negligent misrepresentation claims relating to the April 2016 discussions and client consent is denied.

## II. Negligence

"Duplicative claims shall be dismissed when they are based on identical conduct and seek the same relief." See Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Oregon, Inc., 156 F. Supp. 3d 348, 362 (E.D.N.Y. 2016). Plaintiffs attempt to distinguish their negligence claim from their negligent misrepresentation claim by arguing that the former arises

12

out of Investcorp's <u>failure to ascertain</u> whether it needed client consent, while the latter rests on <u>misleading representations to Plaintiffs</u> regarding the need for client consent. This is a distinction without a difference. An element of a negligent misrepresentation claim is that "the defendant made a false representation <u>that he or she should have known was incorrect</u>." <u>Anschutz</u>, 690 F.3d at 114 (emphasis added). Thus, Investcorp's failure to verify the need for investor consent is a part of the negligent misrepresentation claim. Accordingly, the negligence claim is dismissed as duplicative.

### III. <u>Breach of Contract</u>

The Project Agreement provides that Investcorp "will not make redemption requests . . . based on Confidential Information disclosed to Investcorp pursuant to [the] Agreement or otherwise use Confidential Information for proprietary trading." (Compl. ¶ 116.) "Confidential Information" is defined as "[a]ll information relating to the terms of this Agreement, as well as any other non-public information exchanged between the parties." (Compl., Ex. A., § 5.1(a)(i).)

The Complaint alleges that after learning of the Man Transaction, Investcorp breached those provisions by redeeming its proprietary capital in May 2016 and its clients' capital in June 2016. However, a party can "waive[] a contractual right when it voluntarily and intentionally abandons the enforcement of that right." <u>Am. Int'l Grp. Europe S.A. (Italy) v. Franco Vago Int'l, Inc.</u>, 756 F. Supp. 2d 369, 380 (S.D.N.Y. 2010) (citing <u>Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.</u>, 448 F.3d 573, 585 (2d Cir. 2006)). "Waiver may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." <u>Gen. Motors Acceptance Corp. v. Clifton–Fine Cent. Sch. Dist.</u>, 85 N.Y.2d 232, 236 (N.Y. 1995). Moreover, the Project Agreement itself contemplates such

13

waivers and provides that any of its terms "may be waived . . . by a written instrument signed . . . by the Party granting such waiver." (Compl., Ex A., § 8.6.) And the confidentiality provision provides that neither party will "use any Confidential Information except as authorized by the disclosing Party." (Compl., Ex. A, § 5.1(d).)

In an email confirming the parties' April conversation, Kortright reiterated its "expectation . . . that Investcorp prop[rietary] capital [would] be redeemed as soon as practicable." (Compl. ¶ 64.) Approximately a month later, Investcorp did precisely that and redeemed its proprietary capital. (Compl. ¶ 118.) Instead of asserting its contractual rights under the Project Agreement, Kortright then entered into the Termination Agreement and the Revenue Sharing Agreement. Kortright's email confirming that Investcorp would redeem its proprietary capital and its subsequent acquiescence in the redemption of those funds, make clear that Kortright waived the anti-redemption clause in the Project Agreement's confidentiality provision.

Moreover, unlike its proprietary capital, Investcorp's client capital was not subject to the confidentiality provision at all. The client capital was withdrawn only after Kortright disclosed the material terms of the Man Transaction to all investors. Accordingly, the breach of contract claim is dismissed.

## IV. Implied Covenant of Good Faith and Fair Dealing

New York law "prohibits either party from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." 1-10 Indus. Assocs., LLC v. Trim Corp. of Am., 297 A.D.2d 630, 631 (2d Dep't 2002). However, this implied covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract. It does not add to the contract a substantive provision not

14

included by the parties." Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, 861 F. Supp. 2d 344, 364 (S.D.N.Y. 2012). Such claims "survive[] a motion to dismiss where the implied promise protects either the contract's central purpose or a party's right under a specific contractual provision." Ret. Bd. of Policemen's Annuity & Ben. Fund of City of Chicago v. Bank of N.Y. Mellon, No. 11-CV-5459 (WHP), 2014 WL 3858469, at *5 (S.D.N.Y. July 30, 2014).

The Complaint alleges that Investcorp breached the "fundamental premise of the Project Agreement" by "destroy[ing]" the Kortright funds. (Compl. ¶ 127.) But Kortright's plan all along was to exit the Project Agreement and enter into an entirely new arrangement with Investcorp. Indeed, termination of the Project Agreement was a condition precedent to entering into the Man Transaction Agreement. (Compl. ¶ 70.) Therefore, Investcorp's conduct did not undermine the Project Agreement.

In addition, "[t]o prove a violation of the implied covenant of good faith and fair dealing, conclusory allegations of a party's failure to act in good faith alone are insufficient; specific factual allegations of a party's bad faith acts are required." Ferguson v. Lion Holding, Inc., 478 F. Supp. 2d 455, 469 (S.D.N.Y. 2007) (citing Prospect St. Ventures I, LLC v. Eclipsys Solutions Corp., 23 A.D.3d 213 (1st Dep't 2005)). The Complaint alleges that Investcorp "breached its obligation to act in good faith" by inducing Kortright to structure the Man Transaction Agreement contingent on Investcorp's participation, while failing to disclose the need for client consent. (Compl. ¶ 128.) These conclusory allegations lack "sufficient factual matter" to allow this Court "to draw the reasonable inference that" Investcorp "acted in bad faith." Wells Fargo Bank Nw., N.A. v. Sundowner Alexandria, LLC, No. 09-CV-7313 (BSJ), 2010 WL 3238948, at *4 (S.D.N.Y. Aug. 16, 2010). And in responding to Investcorp's Rule

15

9(b) argument, Kortright asserts that it is pleading negligence, not fraud, with respect to its tort claims. (ECF No. 32 at 9.) Thus, the Complaint alleges negligence, not bad faith. That is insufficient to state a claim for breach of the implied covenant. See Paul v. Bank of Am. Corp., No. 09-CV-1932 (ENV), 2011 WL 684083, at *6 (E.D.N.Y. Feb. 16, 2011) ("To succeed on [a claim for breach of the implied covenant], more than negligence is needed.").

V. **Promissory Estoppel**

"The elements of a claim for promissory estoppel are: (1) a promise that is sufficiently clear and unambiguous; (2) reasonable reliance on the promise by a party; and (3) injury caused by the reliance." MatlinPatterson ATA Holdings LLC v. Federal Express Corp., 87 A.D.3d 836, 841–42 (1st Dep't 2011). Generally, "[p]romissory estoppel . . . is a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason." Paxi, LLC v. Shiseido Americas Corp., 636 F. Supp. 2d 275, 287 (S.D.N.Y. 2009).

Here, the Complaint alleges only that Investcorp expressed its preferred structure for and interest in the Man Transaction. (See Compl. ¶ 63 ("[Investcorp] agreed that the first structure was indeed preferable and that Investcorp would like to participate in the transaction.").) However, the Complaint does not allege any promise, much less a "clear and unambiguous" promise to go forward with the transaction. Accordingly, the promissory estoppel claim is dismissed.

## CONCLUSION

For the foregoing reasons, Investcorp's motion to dismiss is granted in part and denied in part. The motion is granted with respect to the breach of contract, implied covenant of good faith and fair dealing, promissory estoppel, and negligence claims. The motion is denied with respect to that portion of Kortright's negligent misrepresentation claim that pertains to the April 2016 discussions and Investcorp's need for client consent.

The Clerk of Court is directed to terminate the motion pending at ECF No. 24.

Dated: June 27, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.