UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KORTRIGHT CAPITAL PARTNERS LP, MATTHEW TAYLOR AND TY POPPLEWELL,

                 Plaintiffs,

v.

INVESTCORP INVESTMENT ADVISERS LIMITED,

                 Defendant.

Case No. 16-cv-7619 (WHP)

**Public Version - Redacted**

---

**OMNIBUS REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS KORTRIGHT CAPITAL PARTNERS LP, MATTHEW TAYLOR, AND TY POPPLEWELL'S MOTIONS TO AMEND THE COMPLAINT AND FOR SANCTIONS, AND TO STRIKE DEFENDANT INVESTCORP'S DEMAND FOR TRIAL BY JURY**

CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

*Counsel for Plaintiffs Kortright Capital Partners LP, Matthew Taylor, and Ty Popplewell*

January 24, 2018

## **TABLE OF CONTENTS**

                                                                                                                                            **PAGE**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

DISCUSSION .......................................................................................................................... 4

I.       PLAINTIFFS' PROPOSED BREACH OF THE RSA CLAIM IS NOT FUTILE ............ 4

     A.     The RSA's Express Provisions, Investcorp's Conduct, And Rules Of Contract Construction Demonstrate That RSA § 5.2 Is A Condition Precedent To Performance .................................................................................................................. 6

                 1.     Investcorp Fails to Address the RSA's Provisions Indicating That It Was Binding Upon Execution ................................................................... 7

                 2.     Investcorp's Conduct Following Execution of the RSA Recognized the Existence of a Binding Contractual Commitment, and Investcorp's Interpretation of the RSA Is Not Commercially Reasonable ............................................................................................. 7

                 3.     Investcorp's Interpretation of the RSA Would Render the RSA Illusory ................................................................................................... 10

     B.     The Failure Of RSA § 5.2 Does Not Excuse Investcorp's Performance .......................... 10

II.     THE COURT SHOULD AWARD PLAINTIFFS COSTS ................................................ 12

III.    THE BROAD JURY WAIVER PROVISIONS IN THE PARTIES' AGREEMENTS APPLY TO PLAINTIFFS' NEGLIGENT MISREPRESENTATION AND PROPOSED BREACH OF CONTRACT CLAIMS .................................................................................................................. 12

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES:**

*Adams v. Suozzi*,
    433 F.3d 220 (2d Cir. 2005) ............................................................................................... 6

*Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.*,
    807 F.Supp. 1007 (S.D.N.Y. 1992) ..................................................................................... 7

*Collins v. Harrison-Bode*,
    303 F.3d 429 (2d Cir. 2002) ............................................................................................... 9

*Complex Sys., Inc. v. ABN AMRO Bank N.V.*,
    954 F. Supp. 2d 199 (S.D.N.Y. 2013) ................................................................................ 9

*Edelstein v. Stewart*,
    No. 108142/2000, 2001 WL 36390041 (Sup. Ct. N.Y. Cnty. June 13, 2001) ................. 10

*Ellan Corp. v. Dongkwang Int'l Co.*,
    No. 09 Civ. 414 LAP, 2011 WL 4343844 (S.D.N.Y. Aug. 15, 2011) ................................ 6

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*,
    716 F.3d 302 (2d Cir. 2013) ............................................................................................... 4

*Garrett v. Music Publ'g Co. of Am., LLC*,
    740 F. Supp. 2d 457 (S.D.N.Y. 2010) ................................................................................ 6

*Heyman v. Kline*,
    456 F.2d 123 (2d Cir. 1972) ............................................................................................. 13

*JA Apparel Corp. v. Abboud*,
    568 F.3d 390 (2d Cir. 2009) ............................................................................................... 9

*Klauber Bros. v. Westchester Lace Inc.*,
    No. 87 CIV. 7370 (BN), 1989 WL 31679 (S.D.N.Y. Mar. 30, 1989) .............................. 10

*Kooleraire Serv. & Installation Corp. v. Bd. of Ed. of City of N.Y.*,
    268 N.E.2d 782 (N.Y. 1971) ....................................................................................... 4, 11

*Lee Dodge, Inc. v. Kia Motors Am., Inc.*,
    No. Civ. A. 10-5939 JAP, 2011 WL 3859914 (D.N.J. Aug. 31, 2011) ............................. 6

*NES Fin. Corp. v. JPMorgan Chase Bank, N.A.*,
    556 F. App'x 12 (2d Cir. 2014) (unpublished) .................................................................. 4

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
    86 N.Y.2d 685 (1995) ........................................................................................... 5

*Orlander v. Staples*, Inc.,
    802 F.3d 289 (2d Cir. 2015) ................................................................................. 9

*Sony Music Entm't, Inc. v. Werre*,
    907 N.Y.S.2d 441 (TABLE), 2010 WL 1049292 (TEXT IN WESTLAW)
    (Sup. Ct. 2010) .................................................................................................. 11

*Stroll v. Epstein*,
    818 F. Supp. 640 (S.D.N.Y.), *aff'd*, 9 F.3d 1537 (2d Cir. 1993) .............................. 8

*Wachtel v. Nat'l R.R. Passenger Corp.*,
    No. 11 Civ. 613 (PAC), 2012 WL 292352 (S.D.N.Y. Jan. 30, 2012) ...................... 11

**STATUTES & OTHER AUTHORITIES:**

13 Richard A. Lord, Williston on Contracts § 38.4 (4th ed. 2017) ................................... 5

## **PRELIMINARY STATEMENT**

If nothing else, Investcorp's brief in opposition (the "Opposition" or "Opp.") to Plaintiffs' motions lays bare its strategy: to rely on invective, innuendo and character assassination while ignoring or distorting the evidence and caselaw.[1] Investcorp's narrative is that of two "entitled" and "vainglorious" investment managers seeking to blame Investcorp for their failures. But the real narrative is based on actual evidence: that of two diligent, historically successful investment professionals who worked tirelessly, delivering top-quartile returns to Kortright Fund investors every year and garnering industry recognition and awards along the way (including awards for which Investcorp nominated them). Adding insult to injury, Investcorp admittedly lied to Plaintiffs, third parties and the Court to deflect responsibility from itself to its own clients.

Investcorp's characterization of its misstatements as 'white lies' for Plaintiffs' benefit strains credulity: businesspersons do not act that way and blaming its clients rather than accepting responsibility was worse, not better, for Plaintiffs. *Contemporaneous* evidence belies Investcorp's after-the-fact 'white lie' spin. For example, Investcorp directed that its Investment Committee minutes be falsified to cover up the lie (Declaration of Jason M. Halper, submitted herewith ("Halper Decl."), Ex. 1). None of the evidence indicates that Investcorp acted other than for naked self-interest in repeatedly and knowingly lying to Plaintiffs and Man; had it truly been trying to help Plaintiffs, Investcorp presumably would have come clean when it learned its 'white lie' was of no help and the Man Transaction was not going to close. Investcorp also incorporated the lie into its litigation strategy until forced to confess rather than have its clients

---

[1] Capitalized terms used, but not otherwise defined, herein shall have the meaning ascribed to them in Plaintiffs' Motion to Strike ("MTS") brief, ECF No. 64, and Plaintiffs' Motion to Amend ("MTA") brief, ECF No. 67.

deposed on the issue. Investcorp's contention that it had no obligation to "disabuse" Plaintiffs or the Court about its misstatements because it had to accept the truth of allegations in the Complaint that were based on those misstatements is shameless and confirms Investcorp's comfort with deception and refusal to accept responsibility.

It is not surprising, then, that the narrative Investcorp is now peddling ignores, distorts or seeks to distract attention from the *contemporaneous* evidence of its misconduct in favor of litigation positions supported by after-the-fact arguments expressed in court filings and deposition testimony of Investcorp witnesses (often under questioning from Investcorp's counsel following lengthy breaks). For example:

- The contemporaneous evidence demonstrates that Plaintiffs never "secretly promis[ed] to deliver funds from Investcorp's clients to Man." Opp. at 1. Starting in April 2016 Investcorp, by words and conduct, sought to participate in a transaction structured such that Investcorp maintained its clients' capital invested through closing (*see* Halper Decl., Ex. 2; Taylor Dep. Tr. (Halper Decl., Ex. 3) at 22:14-28:19); the RSA that Investcorp signed reflected that structure and provided that Man received no economics from Investcorp's clients (*see* RSA § 1.1); its clients' funds were not being "delivered" to Man but would remain in the Kortright Funds; and no one forced it to sign the RSA—Investcorp chose to participate by committing to leave its clients' funds invested through closing.
- Plaintiffs did not "deceive the Court" in stating that the Man Transaction failed to close because Investcorp revoked its consent, nor is there a basis for Investcorp's assertion that Man was seeking a way out of the transaction. Opp. at 3. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ That condition required "receipt of Requisite Kortright Investor Consent," defined as consent necessary under the Kortright Funds' governing documents to effectuate the changes contemplated by the Man Transaction, including changing the investment manager and general partner. Those changes could not be consummated under the governing documents without Investcorp's consent because it accounted for approximately 80% of the Funds' capital. *See, e.g.*, Halper Decl., Ex. 6 §15.1; Taylor Dep. Tr. (Halper Decl., Ex. 3) at 16:6-18:9.[2]

---

[2] Investcorp's reliance on § 5.2 of the Man Transaction Agreement, regarding not counting non-consenting investors toward the Requisite Kortright Investor Consent, plainly addresses

- Investcorp's assertion that it never "saw" the Man Transaction Agreement (Opp. at 7) ignores the Termination Agreement, which states that the Man Transaction Agreement (among others) "shall constitute the entire agreement among the Parties with respect to the subject matter hereof." Termination Agreement § 4.3. The RSA also includes the Man Transaction Agreement as a defined term and uses that term no less than five times, including in connection with defining other terms. RSA Fourth Whereas Clause, §§ 4.4, 4.5, Appendix. Having executed contracts that expressly incorporate and refer to the Man Transaction Agreement, Investcorp cannot plausibly argue that its terms were hidden. Investcorp's executives certainly could have requested the Man Transaction Agreement, and it remains unclear if Investcorp's lawyers at Sidley Austin LLP—which represented all parties here—possessed and reviewed the Man Transaction Agreement. In short, the notion that Investcorp was a victim of its own failure to review an agreement expressly made part of the Termination Agreement is a farce.

On the merits, while Investcorp's omnibus brief may lack length (as it touts), it is also short on substance (explaining its brevity):

*First*, Investcorp's attempt to show futility rests entirely on its insistence that RSA § 5.2 establishes a condition precedent to contract formation. Multiple other provisions in the RSA unambiguously provide that the parties "inten[d] to be legally bound" on execution. MTA Br. at 10. That conclusion is amply supported by the facts, which Investcorp never meaningfully addresses, that adopting its interpretation would defeat the only purpose of the RSA (*i.e.*, that client funds be maintained through closing); be inconsistent with Investcorp's conduct (*e.g.*, Investcorp's Nick Vamvakas justifying the redemption of client capital based on the RSA's terms, not its effectiveness); and contravene black letter rules of contract construction to avoid interpretations that render contracts illusory.

*Second,* Investcorp's acknowledgment that it seeks to avoid its obligations under the RSA based on Investcorp itself having caused the failure of a condition precedent should be rejected.

---

investors other than Investcorp, which *already had consented* via its representations and conduct between April and June 2016, including by signing the RSA. Given the need for Investcorp's consent under the Kortright Funds' governing documents to change the investment manager and general partner, the entire transaction structure makes no sense whatsoever unless all parties understood Investcorp already to have consented at the time the Man Transaction Agreement was executed.

Investcorp concedes that the failure of the condition in § 5.2 does not excuse its obligations here should the Court decide that § 5.2 constitutes a condition precedent to performance. And, New York courts have refused to allow a party to evade its contractual obligations where it frustrated the occurrence of a condition to the "effective existence" of the contract. *Kooleraire Serv. & Installation Corp. v. Bd. of Educ. of N.Y.*, 268 N.E.2d 782, 784 (N.Y. 1971).

*Third*, Investcorp's half-hearted argument that the scope of the jury waiver does not encompass Plaintiffs' negligent misrepresentation claim relies on a hyper-narrow construction of the cause of action that finds no support in the applicable case law. Plaintiffs' claim, including the special relationship upon which it is premised, indisputably arises from Investcorp's conduct in the context of the parties' relationship, the entire span of which was governed by contracts containing broad jury waivers that cover the substance of the claim at issue.

## DISCUSSION

### I. PLAINTIFFS' PROPOSED BREACH OF THE RSA CLAIM IS NOT FUTILE

Investcorp's contention that RSA § 5.2 unambiguously establishes the parties' intent to create a condition precedent to contract formation is the result of its myopic focus on the language of § 5.2 to the exclusion of the rest of the contract. Contracts must be read as a whole, and courts should interpret them to effect the general purpose of the contract and the intention of the parties. MTA Br. at 6-8. Courts "do not consider particular phrases in isolation, but rather interpret them in light of the parties' intent as manifested by the contract as a whole." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013); *NES Fin. Corp. v. JPMorgan Chase Bank, N.A.*, 556 F. App'x 12, 14–15 (2d Cir. 2014) (unpublished) (rejecting district court's focus on single sentence, which "may have led the court to place 'undue emphasis' on the clause itself while rendering other language in the [contract]

superfluous.") (citation omitted).

Here, Investcorp ignores that the parties expressed in three separate provisions that the RSA is "binding" and that the parties "inten[d] to be legally bound"—language that courts time and again have held evidences an intent to be presently bound notwithstanding conditions in the agreement. MTA Br. at 8-12. Investcorp's brusque dismissal of what it calls "standard provisions" flies in the face of abundant caselaw relying on exactly these types of provisions to find contracts enforceable. Moreover, the very premise of the RSA necessitated that Investcorp's clients' assets remain invested through closing—otherwise the agreement was pointless and illusory, a fact also not contested by Investcorp. There is no basis for Investcorp's reading of a single provision to ignore the purpose of the RSA and effectively wipe out the foregoing contractual provisions expressing an intent to be legally bound.

The authorities relied upon by Investcorp do not support its interpretation of the RSA. For example, Investcorp outright misstates the holding in *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415 (N.Y. 1995), by misleading internal quotations: according to Investcorp, "language stating that an agreement would be 'null and void and of no further force and effect' if a condition did not occur before a certain date 'unambiguously establishes' an express condition precedent to contract formation." *Id.* at 418. Instead, the court held that the relevant language "unambiguously establishes an express condition precedent rather than a promise[.]" *Id.* Distinguishing a promise from a condition says nothing about whether the condition is to performance or formation. *See, e.g.*, 13 Richard A. Lord, *Williston on Contracts* § 38.4 (4th ed. 2017). The court held that because the provision was a condition, not a promise, the doctrine of substantial performance was inapplicable. *Oppenheimer*, 660 N.E.2d at 419.

The other decisions cited by Investcorp, none of which contains the "valid and binding" language found in the RSA according to the opinions, likewise do not support the result it

advocates. Critically, and despite Investcorp being "dumbfound[ed]," (Opp. at 12 n.3), no decision approves of what Investcorp seeks here, namely, excusing its performance based on its breach of the RSA, which thereby caused a closing condition in the Man Transaction Agreement to fail and as a result impacted a condition in the RSA. Rather, Investcorp's decisions involve situations where the plaintiff controlled but did not satisfy the occurrence of the condition. *See Ellan Corp. v. Dongkwang Int'l Co.*, No. 09 Civ. 414 (LAP), 2011 WL 4343844, at *2–3 (S.D.N.Y. Aug. 15, 2011) (contract for plaintiff Ellan to sell Victoria's Secret merchandise to Dongkwang for distribution in South Korea conditioned on Ellan executing agreement, which never occurred, with Victoria's Secret enabling Ellan to purchase its goods); *Lee Dodge, Inc. v. Kia Motors Am., Inc.*, Civ. A. No. 10-5939 (JAP), 2011 WL 3859914, at *3–4 (D.N.J. Aug. 31, 2011) (agreement for plaintiff to become authorized Kia dealer conditioned on obtaining financing and commencing operations by a certain date, neither of which plaintiff did); *Adams v. Suozzi*, 433 F.3d 220, 227–28 (2d Cir. 2005) (plaintiff union members not entitled to certain payment benefits conditioned on union timely executing a collective bargaining agreement with county, which did not occur); *Garrett v. Music Publ'g Co. of Am., LLC*, 740 F. Supp. 2d 457, 462 (S.D.N.Y. 2010) (condition held to be for performance, not formation).

### A. The RSA's Express Provisions, Investcorp's Conduct, And Rules Of Contract Construction Demonstrate That RSA § 5.2 Is A Condition Precedent To Performance

Investcorp asserts that Plaintiffs have "repeatedly confirmed" that the RSA contained a condition precedent to formation merely by taking note of § 5.2 in prior correspondence and filings. Opp. at 12-13. But pointing to a provision in a contract says nothing about, and in fact begs the question regarding, the legal effect of that provision—whether § 5.2 is a condition precedent to formation or performance. Plaintiffs never argued in any prior submission or letter that § 5.2 was a condition precedent to formation. Instead, Plaintiffs cited that provision to

explain that they did not assert a claim for breach of the RSA at the outset because, based on Investcorp's deception, Plaintiffs understood that a third party (Investcorp's clients) caused the failure of the condition, not knowing it was Investcorp itself that brought about that result.

        **1.    Investcorp Fails to Address the RSA's Provisions Indicating That It Was Binding Upon Execution**

Plaintiffs' MTA established that the RSA is enforceable because it contains no less than seven provisions evidencing an intent to be bound on signing. MTA Br. at 10-11. Investcorp fails to meaningfully reply, instead dismissing them as "standard provisions" that come into effect upon the satisfaction of a condition precedent. Opp. at 16. Notably, Investcorp essentially ignores cases like *Cauff, Lippman*, where similar provisions indicating an intent to be bound led the court to find a binding contract and hold that conditions in the contract were precedent to performance. *Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.*, 807 F. Supp. 1007, 1020-24 (S.D.N.Y. 1992). In that case, the court relied on the contract's statement that "'it constitutes a binding agreement'" in determining that four conditions in the agreement were conditions precedent to performance. *Id.* at 1021. *Cauff, Lippman* also gives the lie to Investcorp's attempt to distinguish certain of Plaintiffs' authorities on the ground they concerned the enforceability of preliminary agreements. *Cauff, Lippman* did not involve a preliminary agreement, but that court cited to decisions involving preliminary agreements, including cases cited by Plaintiffs, in finding that a condition was one to performance, not formation. *See id.* at 1020-21.

        **2.    Investcorp's Conduct Following Execution of the RSA Recognized the Existence of a Binding Contractual Commitment, and Investcorp's Interpretation of the RSA Is Not Commercially Reasonable**

Plaintiffs' MTA demonstrated that Investcorp's conduct following execution of the RSA was consistent with the existence of a binding contractual commitment. MTA Br. at 12-15. For example, Investcorp approved language acknowledging Investcorp's continuing "partnership"

with Plaintiffs—a partnership that would have been governed by the RSA—in a letter sent by Plaintiffs to investors in the Kortright Funds. *Id.* at 13. Similarly, internal Investcorp emails show that senior Investcorp executives approved documents that would govern the Kortright Funds following the consummation of the Man Transaction. *Id.* at 14. Moreover, when reneging on its previously-delivered consent to the Man Transaction, Investcorp defended its right to do so under the terms of the RSA (*not* on the supposed fact that there was no binding agreement). *Id.* Such evidence, among other examples, reveals Investcorp's current—and conveniently contrary—position for the litigation construct it surely is.

In response, Investcorp by and large ignores this evidence, arguing it is irrelevant because the RSA is unambiguous. Opp. at 14. That misstates New York law—the parol evidence rule "does not preclude the Court from considering the conduct of the parties after contract formation." MTA Br. at 13 n.3. Indeed, Investcorp's own authority confirms this point, stating that "the parol[] evidence rule operates to exclude evidence of all prior and contemporaneous negotiations or agreements offered to contradict or modify the terms of their writing." *Stroll v. Epstein*, 818 F. Supp. 640, 645 (S.D.N.Y.), *aff'd*, 9 F.3d 1537 (2d Cir. 1993) (citation and quotations omitted).

Investcorp does address Mr. Vamvakas' email in which he affirms the effectiveness of the RSA by stating that a termination event had occurred thereunder. Investcorp now attempts to explain away that remark as "reveal[ing] only that Investcorp fully expected the Man Transaction to close." Opp. at 14 n.4. That makes no sense. If Mr. Vamvakas' statement truly reflected that view, one would expect him to have said as much in the numerous emails addressing this issue. Instead, he described Investcorp's about-face as a "serious problem" at the time, sought to justify its conduct based on RSA terms he obviously viewed as effective, lied about the reason for that conduct, and testified recently that he was "shocked" by Investcorp's

-8-

decision. Vamvakas Dep. Tr. (Halper Decl. Ex. 7), at 198:1-11, 207:23-208:13.

Even if the parol evidence rule applied to post-execution conduct, which it does not, the meaning of an ambiguous contract "may be clarified by extrinsic evidence." *Orlander v. Staples*, Inc., 802 F.3d 289, 297 (2d Cir. 2015). Extrinsic evidence such as "the conduct of parties provides [an] important source for deriving their intent as to the meaning of the . . . contracts . . . there is no surer way to find out [the intent of the parties to a contract] . . . than to see what they have done." *Complex Sys., Inc. v. ABN AMRO Bank N.V.*, 954 F. Supp. 2d 199, 207 (S.D.N.Y. 2013). A contract is unambiguous only if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (citation omitted).

Here, the RSA unambiguously reflects the parties' intent to be bound upon execution by virtue of the numerous provisions cited above and in the MTA moving brief. If the Court concludes otherwise, in the alternative, it should find the RSA ambiguous and consider Plaintiffs' evidence. *See Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002) ("In deciding whether an agreement is ambiguous, [p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.").

For similar reasons, the Court should reject Investcorp's contention that New York law prohibits Plaintiffs' argument that Investcorp's interpretation of the RSA is not commercially reasonable due to the supposedly unambiguous terms of the RSA. Investcorp does not dispute that New York courts avoid commercially unreasonable interpretations of contracts unless it is clear that the parties intended such a result—and there is no basis for such a conclusion here. MTA Br. at 17-18.

### 3. Investcorp's Interpretation of the RSA Would Render the RSA Illusory

Plaintiffs established that Investcorp's interpretation of the RSA—that Investcorp could effectively walk away from the RSA at any time, with no obligations, simply by causing the failure of a condition precedent—would render the RSA illusory. MTA Br. at 15-17. Rather than respond, Investcorp argues that conditions precedent are enforceable even when one party controls whether that condition is met. That is beside the point. The *relevant point* is that under Investcorp's interpretation, the RSA imposed no obligations on Investcorp whatsoever—not merely that it gave Investcorp control of the condition's occurrence—while Man and Plaintiffs were bound under the Agreement. *Id.* at 17; *see Klauber Bros. v. Westchester Lace Inc.*, No. 87 CIV. 7370 (BN), 1989 WL 31679, at *3 (S.D.N.Y. Mar. 30, 1989) ("When provisions of supposed promise leave promisor's performance optional or entirely within discretion, pleasure and control of promisor, the promise is illusory."). Investcorp does not dispute that well settled New York law disfavors constructions that render contracts illusory. MTA Br. at 16.[3]

### B. The Failure Of RSA § 5.2 Does Not Excuse Investcorp's Performance

Investcorp contends that it is not liable under the RSA because the prevention doctrine—pursuant to which a party may not rely on the failure of a condition precedent to avoid contractual responsibility when it caused the condition to fail—does not apply since, according to Investcorp, § 5.2 is a condition precedent to contract formation. *See* Opp. at 11-12. Even if § 5.2 were a condition precedent to formation, which it is not, New York courts have applied the prevention doctrine in that situation to avoid permitting a party to utilize a "provision of a

---

[3] The lone decision cited by Investcorp, *Edelstein v. Stewart*, No. 108142/2000, 2001 WL 36390041, at *5–6 (Sup. Ct. N.Y. June 13, 2001), is inapposite because there, unlike here, the seller never delivered a fully executed contract to the buyer of an apartment building. Here, of course, the RSA was executed, indicated that the parties intended it to be valid and binding, and the parties' conduct evidenced their views that it was operative.

contract having one purpose"—like an indorsement by the city comptroller that funds existed to satisfy payments on the contract—"to accomplish another purpose," *i.e.*, reject an executed contract when funds existed for payment by nonetheless instructing the comptroller not to indorse it. See *Kooleraire*, 268 N.E.2d at 784 ("[t]he general rule is . . . that a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition," which in this case was to the contract becoming "binding," and "[t]here seems no reason . . . why the general rule is not applicable [here]").[4]

That is precisely what Investcorp seeks to accomplish here: RSA § 5.2 had "one purpose"—it was added to drafts of the RSA by Man to make clear that Man had no obligations to share revenue with Investcorp thereunder if the Man Transaction failed to close. In that event, Investcorp obviously would have no obligation to maintain client capital invested throughout closing of a transaction that failed to close. But that is very different from Investcorp's attempt to utilize that provision "to accomplish another purpose," namely to affirmatively breach its obligations under the RSA, cause the Man Transaction not to close, then benefit from that misconduct by claiming that a failed RSA condition excuses its contractual obligations. To paraphrase the court in *Kooleraire*, "[t]here is no suggestion in any part of the [RSA] that [the parties] intended [Investcorp] should have a veto" of the Man Transaction. 268 N.E.2d at 784.

---

[4] Investcorp's reliance on decisions involving conditions precedent to *formation* is misplaced. None of these cases involves the facts here: an unequivocal offer and acceptance of a contract in which the parties clearly and unambiguously evince throughout the written agreement an intent to be bound upon execution. See *Wachtel v. Nat'l R.R. Passenger Corp.*, No. 11 Civ. 613 (PAC), 2012 WL 292352, at *2 (S.D.N.Y. Jan. 30, 2012) (offer of employment was conditioned on physical and mental examinations, and parties never entered into a written agreement); *Sony Music Entm't, Inc. v. Werre*, 907 N.Y.S.2d 441 (TABLE), 2010 WL 1049292, at *2 (TEXT IN WESTLAW) (Sup. Ct. N.Y. Cty. 2010) (restrictions in defendant's prior employment agreement prevented him from unequivocally accepting the terms of plaintiff's agreement and parties contemplated that plaintiff may not be available for employment with Sony).

## II. THE COURT SHOULD AWARD PLAINTIFFS COSTS

Courts typically allow amendments after a lie was uncovered during discovery and punish such conduct by awarding resulting costs. MTA Br. at 22-25. Investcorp ignores Plaintiffs' arguments and authorities on this point, instead contending without support that the Court should sanction Plaintiffs for unidentified arguments made in the MTA Brief (Opp. at 17), a brief the Court affirmatively permitted Plaintiffs to file. The Court should also disregard the insinuation that Plaintiffs tried to hide the fact that Investcorp's counsel belatedly disclosed the investor consent lie in July 2017: Plaintiffs expressly noted this point in correspondence to the Court and in the MTA Brief. *See* Oct. 18 Letter at 1-2; MTA Br. at 2. As Investcorp conceded, its counsel merely described the lie at a high level and named the employees who could explain it more fully, which does not change the fact that Plaintiffs were forced to incur significant expenses from discovery efforts after July 2017 to develop evidence of Investcorp's deception and to draft the MTA and the proposed amended Complaint.

## III. THE BROAD JURY WAIVER PROVISIONS IN THE PARTIES' AGREEMENTS APPLY TO PLAINTIFFS' NEGLIGENT MISREPRESENTATION AND PROPOSED BREACH OF CONTRACT CLAIMS

Plaintiffs established that Investcorp is bound by the broad jury waiver provisions in the Investcorp-KCP Agreements and the RSA, all of which apply to Plaintiffs' negligent misrepresentation and proposed breach of contract claims. *See* MTS Br. at 9-16. Investcorp concedes the majority of Plaintiffs' arguments and fails to explain how Plaintiffs' claims do not fall within the relevant jury waiver provisions. Opp. at 18-20.

*First*, Investcorp does not attempt to refute that the jury waivers in the four relevant agreements are enforceable because Investcorp voluntarily, knowingly, and intentionally waived

its right to a jury trial when it executed the agreements.  See MTS Br. at 9-13.[5]  Second, Investcorp asserts that the jury waivers are inapplicable because Plaintiffs' negligent misrepresentation and proposed contractual claims do not relate to the "operation" of the Kortright Funds or to any of the relevant agreements when the waiver language is "strictly" construed.  Opp. at 19.  This downplays the fact that courts interpret "relating to" in jury waiver provisions *broadly*—not strictly—and will extend those provisions to non-contract claims that "relate to" the relationship between the parties.  See MTS Br. at 14.  Here, it is difficult to conceive of a claim more directly tied to the "operation of the funds."  Specifically, as part of the Man Transaction, investors were being asked to consent to changes to the Kortright Funds' general partner and investment manager, *i.e.*, the entities primarily responsible for the operation of the Funds.  Moreover, the jury waiver provisions are contained in the Project Agreement, the Termination Agreement and the Amended Termination Agreement, which collectively cover the birth, life and death of the parties' relationship—and Plaintiffs' negligent misrepresentation claim, including the special relationship upon which it is premised, unquestionably arises from Investcorp's conduct during that period in the context of their business relationship.

---

[5]  Although Investcorp urges the Court to adopt a strong presumption against jury waivers, its authorities are distinguishable because they do not involve jury waivers contained, as here, in written, executed contracts negotiated by sophisticated parties represented by well-known outside counsel.  See *Heyman v. Kline*, 456 F.2d 123, 129-30 (2d Cir. 1972) (analyzing whether counsel's failure to respond to the court's remarks during a scheduling conference could be construed as an affirmative jury waiver); *Aetna Ins. Co. v. Kennedy to Use of Bogash*, 301 U.S. 389, 392 (1937) (addressing whether parties had waived their right to a jury trial by requesting a directed verdict).

Dated:  January 24, 2018         Respectfully submitted,
        New York, New York

**CADWALADER, WICKERSHAM & TAFT LLP**

By: /s/ Jason M. Halper
    Jason M. Halper
    Todd Blanche
    Jared Stanisci
    200 Liberty Street
    New York, New York 10281
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666

*Counsel for Plaintiffs Kortright Capital Partners LP, Matthew Taylor, and Ty Popplewell*