UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

KORTRIGHT CAPITAL PARTNERS     :
LP, *et al.*,     :
    :
          Plaintiffs,     :     16cv7619
    :
        -against-     :     <u>OPINION & ORDER</u>
    :
INVESTCORP INVESTMENT ADVISERS     :
LIMITED,     :
    :
          Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

WILLIAM H. PAULEY III, Senior United States District Judge:

       This action arises out of a failed investment venture involving plaintiffs Kortright

Capital Partners LP and its co-founders Matthew Taylor and Ty Popplewell (collectively,

"Kortright") and defendant Investcorp Investment Advisers Limited ("Investcorp").  Following

dismissal of the majority of Kortright's contract and tort claims, Kortright now moves to amend

to add an additional breach of contract claim based on new information allegedly unearthed at

the eleventh hour during discovery.  Kortright also moves to strike Investcorp's jury demand

based on jury waiver provisions contained in the applicable contracts between the parties.

Finally, each side moves for sanctions against the other.  For the reasons that follow, Kortright's

motion to amend is denied, Kortright's motion to strike Investcorp's jury demand is granted, and

both motions for sanctions are denied.

BACKGROUND

       The facts of this case are more fully detailed in the Opinion & Order granting in

part and denying in part Investcorp's motion to dismiss, familiarity with which is presumed.

<u>Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.</u>, 257 F. Supp. 3d 348 (S.D.N.Y.

2017).  Nonetheless, a brief recapitulation of the relevant background is warranted.

I.      Factual Background

            In November 2013, Kortright and Investcorp entered into a Project Agreement,

under which Investcorp promised to invest $50 million of proprietary capital and $40 million of

its clients' capital in Kortright funds and market those funds to new investors in exchange for

certain economic benefits it would receive as a seed investor.  In January 2015, Plaintiffs began

discussions with Man Group plc ("Man Group")—an asset management company and

competitor of Investcorp's—about moving the Kortright funds into Man Group's organization or

having Taylor and Popplewell join Man Group as employees while winding down the Kortright

fund.  In April 2016, Investcorp expressed its preference for moving the Kortright funds into

Man Group (as opposed to winding down the funds) and proposed that it leave its clients'

investment with Kortright while withdrawing its proprietary investment.  Kortright sent

Investcorp an email summarizing the contours of this discussion; namely, that Kortright's funds

would be moved to Man Group, that Investcorp would maintain a certain level of investment for

six quarters to maintain revenue sharing benefits, and that Investcorp would immediately redeem

its proprietary investment while leaving its clients' capital invested.

            Contemplating Investcorp's participation, Kortright and Man Group entered into

the Man Transaction Agreement on June 16, 2016, the closing of which was expressly

conditioned on Kortright maintaining a certain quantum of Investcorp capital.  At the same time,

Kortright and Investcorp entered into a Termination Agreement, which ended their relationship

under the Project Agreement.  Kortright and Investcorp also entered into a Revenue Sharing

Agreement ("RSA"), under which Investcorp would continue to share revenue, but which

included a termination provision triggered if Investcorp redeemed capital exceeding a certain

amount.  In relevant part, § 5.2 of the RSA also provided that "[t]his Agreement is conditional on the occurrence" of the closing of the Man Transaction and that if the Man Transaction did not close "by September 30, 2016, this Agreement shall not come into effect and shall be null and void . . . ."  (Memorandum of Law in Support of Plaintiffs' Motion to Amend the Complaint and for Sanctions, ECF No. 67 ("Motion to Amend"), Ex. 1 ("Proposed Amended Complaint"), Ex. 2 ("RSA") § 5.2.)

On June 17, 2016, Kortright informed its investors by letter of the Man Transaction and sought their consent to transfer their investments to Man Group.  The letter also indicated that Investcorp planned to continue its partnership with Kortright.  Investcorp returned its consent forms as an investor of Kortright's.  But shortly thereafter, Investcorp revoked its consent, claiming that it was required to obtain its <u>own</u> clients' consent, and because they did not consent, Investcorp was required to redeem its clients' investment.  Consequently, because a closing condition for the Man Transaction was not satisfied, Man Group was relieved of its obligation to close the transaction.

II.    Procedural History

Kortright brought various claims for negligent misrepresentation, negligence, breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel.  Following Investcorp's motion to dismiss, this Court pruned Kortright's claims, leaving only the negligent misrepresentation claims arising from Investcorp's April 2016 promises to leave its clients' capital invested in Kortright while omitting the need for client consent.

After fact discovery closed, Kortright filed a pre-motion letter seeking leave to file the instant motions.  In particular, Kortright seeks to amend its complaint to add a claim for

breach of the RSA based on information unearthed near the close of fact discovery—namely,

that Investcorp's stated rationale for revoking its consent (i.e., because Investcorp needed but

could not obtain its clients' consent) was fabricated.  According to Kortright, Investcorp did not

need its clients' consent at all, and its executives ultimately made the decision to redeem its

clients' capital.  In essence, Kortright claims that it did not originally assert a claim for a breach

of the RSA because it believed—erroneously—that the failure of a condition precedent in the

RSA (i.e., the closing of the Man Transaction) was caused by Investcorp's client and not

Investcorp itself.

DISCUSSION

I.    Motion to Amend

Although Rule 15 of the Federal Rules of Civil Procedure exhorts courts to

"freely give leave when justice so requires," see Fed. R. Civ. P. 15(a)(2), it is well-settled that a

court has discretion to deny leave to amend even under this liberal standard if, for example, the

amendment would be futile, if the movant acted with undue delay, bad faith, or a dilatory motive,

or if granting leave would result in prejudice to the opposing party.  Foman v. Davis, 371 U.S.

178, 182 (1962).[1]

Here, the parties' disagreement centers on whether amendment would be futile.

An amendment is futile "if the proposed claim could not withstand a motion to dismiss pursuant

to Fed. R. Civ. P. 12(b)(6)."  Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir.

2002).  To survive a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556

---

[1]    A party seeking leave to amend must also satisfy Rule 16(b)'s "good cause" standard if a scheduling order sets forth deadlines to file amended pleadings.  While multiple scheduling orders have been entered in this case, none set deadlines for the amendment of pleadings.  Accordingly, Kortright need only satisfy the Rule 15 standard.

U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  In resolving a motion under Rule 12(b)(6), a court accepts a plaintiff's allegations as true and draws all reasonable inferences in its favor.  Gonzalez v. Hasty, 802 F.3d 212, 219 (2d Cir. 2015).  However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Mastafa v. Chevron Corp., 770 F.3d 170, 177 (2d Cir. 2014) (quotation mark omitted).

In considering whether an amended complaint states a claim, a court considers "the proposed amendment[s] . . . along with the remainder of the complaint."  Pyskaty v. Wide World of Cars, LLC, 856 F.3d 216, 225 (2d Cir. 2017).  Although a court generally may not consider documents or other evidence outside of the complaint, it may review documents attached to the pleading or incorporated by reference.  E. Materials Corp. v. Mitsubishi Plastics Composites Am., Inc., 307 F. Supp. 3d 52, 57-58 (E.D.N.Y. 2018); BLT Rest. Grp. v. Tourondel, 855 F. Supp. 2d 4, 15 (S.D.N.Y. 2012).

For this motion, the parties' quarrel as to whether Kortright's proposed breach of contract claim could survive a motion to dismiss centers on the threshold question of the validity and enforceability of the RSA,[2] which in turn implicates two issues: (1) whether § 5.2 of the

---

[2]     A valid breach of contract claim would also require Kortright to plausibly allege a breach of the RSA by Investcorp.  See JP Morgan Chase v. J.H. Elec. of N.Y., Inc., 893 N.Y.S.2d 237, 239 (N.Y. App. Div. 2010) (enumerating the elements of a breach of contract claim).  Kortright's proposed amended complaint alleges that Investcorp breached its obligation in the RSA to maintain client capital invested through the Man Transaction's closing—an obligation that Kortright's counsel conceded does not explicitly appear in the RSA.  (See Feb. 22, 2018 Oral Arg. Tr. at 8:17-9:11; see also Proposed Amended Complaint ¶¶ 119, 123; Motion to Amend, at 2.)  Cf. L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011) (noting that a court need not accept as true allegations contradicted or belied by documents attached to the complaint).  Nonetheless, this Court need not reach this issue based on its determination that the RSA is not valid and enforceable.

RSA creates a condition precedent to formation of the contract or a condition precedent to

Investcorp's performance; and (2) whether the prevention doctrine applies to excuse the non-

occurrence of the RSA's condition precedent.

      A.   Type of Condition Precedent Created by RSA § 5.2

          The RSA contains a choice-of-law provision memorializing the parties'

agreement to apply New York law.  (RSA § 5.14(a).)  New York contract law recognizes two

distinct types of conditions precedent, as explained by the New York Court of Appeals in

Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 660 N.E.2d 415 (N.Y. 1995).  On one

hand, conditions precedent to performance "describe acts or events which must occur before a

party is obliged to perform a promise made pursuant to an existing contract."  Oppenheimer, 660

N.E.2d at 418.  On the other hand, "condition[s] precedent to the formation or existence of the

contract itself" are conceptually distinct, and "no contract arises 'unless and until the condition

occurs.'"  Oppenheimer, 660 N.E.2d at 418 (citation omitted).

          Along another dimension, conditions precedent may also be express or implied.

While an express condition is one "agreed to and imposed by the parties themselves," an implied

or constructive condition is one "'imposed by law to do justice.'"[3]  Oppenheimer, 660 N.E.2d at

418 (citation omitted).  Because an express condition reflects the manifested intent of the parties,

a court "must . . . generally enforce the will of the parties unless to do so will violate public

policy," even if enforcing the condition would generate a harsh result.  Oppenheimer, 660

N.E.2d at 418.  By contrast, because an implied condition is imposed by the law, a court may

"shap[e] the boundaries of the constructive condition in such a way as to do justice and avoid

---

[3]      The import of Oppenheimer's holding is that an express condition "must be literally performed" whereas an implied condition may be satisfied through substantial compliance.  Oppenheimer, 660 N.E.2d at 418.  This distinction is irrelevant, however, because here, the condition did not occur at all.

hardship." Oppenheimer, 660 N.E.2d at 418.

Finally, as a matter of contract interpretation, "a contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." MHR Capital Partners LP v. Presstek, Inc., 912 N.E.2d 43, 47 (N.Y. 2009). A written agreement that is "complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." MHR Capital Partners LP, 912 N.E.2d at 47; see also Ellan Corp. v. Dongkwang Int'l Co., 2011 WL 4343844, at *2 (S.D.N.Y. Aug. 15, 2011) ("Courts will not look beyond the four corners of a contract unless the contractual terms are ambiguous."). The threshold question of contractual ambiguity is a matter of law that a court determines from the face of the agreement. Ellan Corp., 2011 WL 4348344, at *2. In other words, courts do not "examine extrinsic evidence 'to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face.'" Ellan Corp., 2011 WL 4348344, at *2 (quoting Reiss v. Fin. Performance Corp., 764 N.E.2d 958, 961 (N.Y. 2001)).

Here, § 5.2 of the RSA provides that it "is conditional on the occurrence of the Closing. If the Closing does not occur by September 30, 2016, this Agreement shall not come into effect and shall be null and void . . . ." (RSA § 5.2.) Although courts generally interpret doubtful language as a constructive condition rather than an express condition, § 5.2 is clothed in the "unmistakable language of condition," such as "if," "unless," or "until." See MHR Capital Partners LP, 912 N.E.2d at 47; see also Ellan Corp., 2011 WL 4348344, at *3 (citing Oppenheimer, 660 N.E.2d at 418) (finding that the language "conditioned upon" creates a condition precedent). If "'the occurrence of the event is expressed in unmistakable language,'" courts should not interpret such language as a constructive condition. Oppenheimer, 660 N.E.2d at 418 (citation omitted). Accordingly, this Court concludes that the parties' choice of language

evinces their intent to create an express condition precedent.  See Edelman Arts, Inc. v. Art Int'l (UK) Ltd., 841 F. Supp. 2d 810, 826 (S.D.N.Y. 2012) (citing Thor Props., LLC v. Chetrit Grp. LLC, 2010 WL 1740752, at *4 (N.Y. Sup. Ct. Apr. 29, 2010)) (explaining that a court must determine the intent of the parties as expressed in the contract in analyzing whether a condition precedent exists).

Whether § 5.2 was intended to create a condition precedent to performance or a condition precedent to formation is the core of the parties' dispute on this motion.  The thrust of Investcorp's position is that § 5.2 means precisely what it says, and because the Man Transaction did not close before September 30, 2016, the RSA never came into effect such that it could form the foundation of a breach of contract claim.  Indeed, irrespective of the competing interpretations proffered by the parties, the plain language of § 5.2 unambiguously conditions the effectiveness and validity of the RSA on the Man Transaction closing before September 30, 2016—the non-occurrence of which neither party disputes.  See Seiden Assocs., Inc. v. ANC Holdings, 959 F.2d 425, 428 (2d Cir. 1992) ("The language of a contract is not made ambiguous simply because the parties urge different interpretations.").

Construing § 5.2 as creating a condition precedent to performance—i.e., an interpretation in which the closing of the Man Transaction by September 30, 2016 is a condition precedent to Investcorp's performance—invites a circular result.  Cf. Perlbinder v. Bd. of Managers of 411 E. 53rd St. Condo., 886 N.Y.S.2d 378, 381 (N.Y. App. Div. 2009) (reciting canon of construction that "[a]n interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation").  Kortright consistently maintains that the RSA obliges Investcorp to maintain its clients' capital through the closing of the Man Transaction—it is the alleged breach of this contractual promise that

underpins its putative claim for breach of the RSA.  But if § 5.2 operated as a condition

precedent to performance, then Investcorp's performance (i.e., its obligation to leave client

capital invested through closing) would only arise if the Man Transaction closed, which itself

would only occur if Investcorp left its clients' capital invested until the Man Transaction closed.

Thus, this Court interprets § 5.2 to create a condition precedent to the formation of the RSA.  Cf.

Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 53 (2d Cir.

2012) (citations and quotation marks omitted) ("[A]mbiguity exists where a contract term could

suggest more than one meaning when viewed objectively by a reasonably intelligent person who

has examined the context of the entire integrated agreement . . . .").

   This conclusion is bolstered by courts that have interpreted similar language as

creating a condition to contract formation.  E.g., Kapson Const. Corp. v. ARA Plumbing &

Heating Corp., 642 N.Y.S.2d 701, 703 (N.Y. App. Div. 1996) (construing a condition as a

condition precedent to the existence of the contract where the failure of the condition would

render an agreement "null and void"); Office of Comptroller Gen. of Republic of Bolivia v. Int'l

Promotions & Ventures, Ltd., 618 F. Supp. 202, 205, 207 (S.D.N.Y. 1985) (construing a

condition that a contract "would not become effective" as a condition precedent to the existence

of a contract); cf. SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 341 (2d Cir. 2004)

(recounting that Oppenheimer "[found] that a letter agreement contained an express condition

precedent to contract formation where the agreement provided that the contract would be 'null

and void' unless the condition was fulfilled").  Such an interpretation also finds support in

academic treatises.  See Richard A. Lord, 13 Williston on Contracts § 38.7 (4th ed. 2017)

(explaining that when the parties agree "that the contract is not to be effective or binding until

certain conditions are performed or occur, no binding contract will arise until the conditions

specified or have been performed").

Kortright counters that § 5.2 must be construed as a condition precedent to performance because interpreting it as a condition precedent to formation would vitiate other provisions in the RSA that reveal the parties' intent to be legally bound at the time the RSA was executed in June of 2016.  This Court disagrees.  Kortright points out that the RSA's introductory and concluding clauses contain language by the parties "intending to be legally bound," and that § 5.7 of the RSA provides that it "shall be binding upon and inure to the benefit of the Parties and their respective successors and legal representatives."  (See RSA at 1, 13; RSA § 5.7.)  But such language does not necessarily reveal an intent to be bound unconditionally— rather, considered as a whole, the RSA conditions its effectiveness and binding nature on the occurrence of the condition specified in § 5.2.  See Gessin Elec. Contractors, Inc. v. 95 Wall Assocs., LLC, 903 N.Y.S.2d 26, 28 (N.Y. App. Div. 2010) ("[C]ourts should construe a contract in a manner that avoids inconsistencies and reasonably harmonizes its terms." (citation omitted)).  In other words, § 5.2's proviso reflects much more than the mere fact that "various issues and documentation remain[] open."  See Teachers Ins. & Annuity Ass'n v. Tribune Co., 670 F. Supp. 3d 491, 500 (S.D.N.Y. 1987) (finding that terms recognizing that a transaction may involve further documentation and negotiation of open terms is not necessarily incompatible with an intent to create a binding agreement).  Instead, it recognizes that if the Man Transaction failed to close, the RSA—which in essence allowed Investcorp to realize economic benefits so long as it maintained skin in the game—would be pointless.

Moreover, courts have found similarly clear language to create conditions precedent to formation notwithstanding other contractual provisions indicating an intent for the contract to be effective at signing.  See Ellan Corp., 2011 WL 4343844, at *4 (dismissing breach

of contract claim because relevant agreement never became effective based on the failure of a condition precedent to formation).  In Ellan Corp., for example, a distribution agreement provided that it "shall remain in effect so long as" the plaintiff maintained a contract with a third party, and that the agreement "is subject to" the contract with the third party.  Ellan Corp., 2011 WL 4343844, at *2.  Even though the agreement also contained a provision causing it to become effective upon execution, the court found that the contract contained a condition precedent to formation.  See Ellan Corp., 2011 WL 4343844, at *3 (also reasoning that because the plain language of the operative agreement "makes clear that the entire agreement is 'conditioned upon'" the occurrence of a certain act by plaintiff, absent that act, "there could be no contract").

Kortright's remaining arguments on the interpretation of § 5.2 fare no better.  First, while Kortright infers from extrinsic evidence that Investcorp intended the RSA to be a valid and binding contract at the time of execution, courts do not consider parol evidence or extrinsic evidence of the parties' intentions where—as here—the relevant contractual provision is unambiguous.  See JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009); Int'l Klafter Co. v. Cont'l Cas. Co., 869 F.2d 96, 100 (2d Cir. 1989).  Likewise, Kortright's attempts to inject ambiguity into whether § 5.2 creates a condition precedent to formation or a condition precedent to performance contravene judicial reluctance to consider extrinsic evidence "to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face."  Reiss, 764 N.E.2d at 961; accord Kass v. Kass, 696 N.E.2d 174, 180 (N.Y. 1998) ("Ambiguity is determined by looking within the four corners of the document, not to outside sources.").  Second, Kortright posits that interpreting § 5.2 to be a condition precedent to formation is not commercially reasonable because no party would receive the benefit of the bargain if Investcorp withdrew its clients' capital before closing.  Cf. Homeward Res., Inc. Sand Canyon Corp., 298

F.R.D. 116, 129 (S.D.N.Y. 2014) (explaining that under New York law, "a court must avoid any interpretation that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties'" (citation omitted)).  But the fact is that the non-occurrence of <u>any</u> condition precedent to formation can be said to deprive the contracting parties of the benefit of their bargain.  Standing alone, this rationale cannot override the plain and unambiguous language to which the parties agreed.

     B.  <u>Applicability of the Prevention Rule</u>

       Regardless of whether § 5.2 is a condition precedent to performance or formation, Kortright also urges application of the prevention rule, under which a party generally may not take advantage of the non-occurrence of a condition precedent if it has frustrated or prevented the occurrence of the condition.  <u>Kooleraire Serv. & Installation Corp. v. Bd. of Ed. of City of N.Y.</u>, 268 N.E.2d 782, 784 (N.Y. 1971); <u>accord</u> <u>Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.</u>, 807 F. Supp. 1007, 1022 (S.D.N.Y. 1992) (explaining that "[t]he prevention doctrine rests on the precept that no person can rely on the occurrence or non-occurrence of a condition when he wrongfully prevented or caused it" (quotation marks omitted)).  Specifically, Kortright asserts that Investcorp cannot use the failure of the RSA's condition precedent to avoid a breach of contract claim where Investcorp itself caused § 5.2's condition to fail by revoking its consent, which in turn prevented the Man Transaction from closing.

       Investcorp's sole argument on this score is that the prevention rule does not apply when the contractual condition is precedent to <u>formation</u> as opposed to performance.  In support of its position, Investcorp cites to <u>Wachtel v. National Railroad Passenger Corp.</u>, 2012 WL 292352 (S.D.N.Y. Jan. 30, 2012) and <u>Sony Music Entertainment, Inc. v. Werre</u>, 2010 WL 1049292 (N.Y. Sup. Ct. Mar. 17, 2010) for the proposition that a party is under no implied

obligation not to frustrate or prevent the performance of a condition precedent to formation when there is no contract in effect.  Although the reasoning in Wachtel and Sony Music is somewhat conclusory, the notion that such an implied obligation does not arise absent an existing contract appears uncontroversial.  See, e.g., Fast Ball Sports, LLC v. Metro. Entm't & Convention Auth., 835 N.W.2d 782, 791 (Neb. Ct. App. 2013) (noting that under Nebraska law, the prevention doctrine does not apply to a condition precedent to the formation of a contract); Saza, Inc. v. Zota, 2012 WL 527370, at *6 (E.D. Va. Feb. 16, 2012) (citing Moore Bros. Co. v. Brown & Root, Inc., 207 F.3d 717, 725-26 (4th Cir. 2000) (concluding that prevention doctrine is inapplicable to a condition precedent to formation).

Such a rule also accords with principles of contract law and common sense.  The prevention rule, "where it applies, creates nothing more than an implied contractual obligation, similar to . . . the implied covenant of good faith and fair dealing."  Consol. Edison, Inc. v. Ne. Utils., 426 F.3d 524, 529 (2d Cir. 2005) (emphasis in original); accord Restatement (2d) of Contracts § 302 cmt. a (1981).  This implied obligation not to prevent or hinder the occurrence of the condition "exists to serve the intent of the parties, and does not operate at cross-purposes to that intent" or "inconsistent[ly] with other terms of the contractual relationship."  Consol. Edison, Inc., 426 F.3d at 529 (quotation mark omitted) (citing Murphy v. Am. Home Prods. Corp., 448 N.E.2d 86, 91 (N.Y. 1983)).  Thus, applying the rule to the paradigm in which a party seeks to avoid performing under an existing contract by preventing the occurrence of a condition precedent to its performance is logical and accords with the intent of the contracting parties.  To the contrary, an implied contractual obligation not to frustrate the occurrence of a condition precedent to contract formation would either be at odds with the intent of the parties if it arises before the contract even comes into existence, or moot if it arises after the contract has been

formed.  Accordingly, this Court declines to apply the prevention rule to excuse the non-occurrence of § 5.2.  Because this Court concludes that § 5.2 creates a condition precedent to the validity and enforceability of the RSA that did not occur, Kortright's motion to amend is denied as futile.

II.      Motion to Strike Investcorp's Jury Demand

Kortright also seeks to strike the jury demand asserted in Investcorp's answer on the basis that it is barred by the jury waiver provisions in the relevant agreements that Kortright and Investcorp signed.  Resolving this motion requires an analysis of whether the jury waiver provisions are enforceable, and if so, whether the remaining claims in this case fall within the ambit of the jury waiver clauses.  Before addressing the merits of the motion, however, this Court discusses the applicable law.  Because the enforceability of a jury waiver provision—i.e., whether the right to a jury trial has been waived—is a procedural issue, a federal court sitting in diversity generally applies federal law in determining whether the right has been waived.  See Merrill Lynch & Co v. Allegheny Energy, Inc., 500 F.3d 171, 188 (2d Cir. 2007); cf. Martinez v. Bloomberg LP, 740 F.3d 211, 220-21 (2d Cir. 2014) (explaining that the enforceability of forum selection clauses—as distinct from interpretation—is procedural in nature and is governed by federal law).  On the other hand, New York contract law applies to the interpretation of the scope of the jury waiver provisions based on the choice-of-law provisions in the relevant agreements. (See Proposed Amended Complaint, Ex. 1 ("Project Agreement") § 8.15(a); Proposed Amended Complaint, Ex. 3 ("Termination Agreement") § 4.6(a); Proposed Amended Complaint, Ex. 4 ("Amended Termination Agreement") § 4.6(a).)

A.     Enforceability of Jury Waiver Provisions

Although the Seventh Amendment right to a jury trial is "fundamental" and a

14

presumption exists against waiver of that right, "a contractual waiver is enforceable if it is made knowingly, intentionally, and voluntarily." Merrill Lynch & Co., 500 F.3d at 188. The requirement of knowing, intentional, and voluntary waiver is "strictly enforced," and the party seeking to enforce the jury waiver clause bears the burden of showing that the waiver was knowing and voluntary. Sherrod v. Time Warner Cable, Inc., 2014 WL 6603879, at *2 (S.D.N.Y. Nov. 21, 2014). In analyzing whether waiver is knowing and voluntary, courts consider (1) "the negotiability of contract terms and negotiations between the parties concerning the waiver provision"; (2) "the conspicuousness of the waiver provision in the contract"; (3) "the relative bargaining power of the parties"; and (4) "the business acumen of the party opposing the waiver." Morgan Guar. Tr. Co. of N.Y. v. Crane, 36 F. Supp. 2d 602, 603-04 (S.D.N.Y. 1999).

      Here, Investcorp does not seriously contest that the jury waiver provisions were made knowingly, intentionally, and voluntarily. It does not refute, for instance, Kortright's showing that Investcorp was a sophisticated business entity represented by counsel throughout negotiations; that Investcorp provided first drafts of the Project Agreement, RSA, and Termination Agreement—which all included the jury waiver provisions—and commented on subsequent drafts; or that Investcorp commented on subsequent drafts of the Amended Termination Agreement, also containing the jury waiver provision. See, e.g., Wechsler v. Hunt Health Sys., Ltd., 2003 WL 21878815, at *3 (S.D.N.Y. Aug. 8, 2003) (finding contract terms negotiable where "counsel represented defendants, reviewed the contracts, and made some revisions to the documents prior to defendants signing them" and where there was no "evidence suggesting that defendants were in a position where they had no choice but to sign the documents").

      Likewise, there is no indication of any substantial disparity in the bargaining

power of the parties.  See Wechsler, 2003 WL 21878815, at *4 (concluding that the fact that the parties "were all experienced corporate entities, of relatively equal bargaining power" militated in favor of finding jury waivers valid).  Finally, this Court finds that the placement of the jury waiver provisions, which are set off in their own subsection in all-capital letters and in the same size as the language in the agreements, also suggests that the parties' jury trial waiver was knowing and voluntary.  See Wechsler, 2003 WL 21878815, at *5 (collecting cases analyzing "the placement of the waiver, . . . the size and style of the print, . . . and the location of the provision within the entire document" (internal citations omitted)).  That each jury waiver subsection is situated within a section that collates litigation procedures under the heading "GOVERNING LAW; CONSENT TO JURISDICTION" is not dispositive.  Based on a consideration of the totality of the relevant factors, Kortright has satisfied its burden to demonstrating that the jury waiver was knowing, intentional, and voluntary.

     B.  Scope of the Jury Waiver Provisions

       If a contractual jury waiver is enforceable, a court must then analyze whether the claims in the action fall within the scope of the jury waiver clause.  See Sherrod, 2014 WL 6603879, at *2.  In interpreting these provisions, courts have reiterated the general precept that contractual provisions containing jury trial waivers should be "narrowly construed."  See, e.g., Sherrod, 2014 WL 6603879, at *2; Wechsler, 2003 WL 21878815, at *6.  Nonetheless, the plain language of "enforceable waiver provisions must be construed literally."  Wechsler, 2003 WL 21878815, at *6; see also Caplan v. Goldman, 95 N.Y.S.2d 835, 836 (N.Y. App. Div. 1950) ("While undoubtedly a jury waiver clause is to be strictly construed and should not be extended beyond its plain meaning, a court may not, in seeming obedience to this rule of construction, override the clear and unambiguous language in which the parties . . . have expressed their

purpose.").

The relevant provisions are as follows:[4]

EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM RELATING IN ANY WAY TO THIS AGREEMENT OR THE OPERATION OF THE FUND.

(Project Agreement § 8.15(c).)

EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM RELATING IN ANY WAY TO THIS TERMINATION AGREEMENT OR THE OPERATION OF THE FUND.

(Termination Agreement § 4.6(c).)

EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM RELATING IN ANY WAY TO THIS TERMINATION AGREEMENT OR THE OPERATION OF THE FUND.

(Amended Termination Agreement § 4.6(c).)

Here, the relevant inquiry is whether these provisions encompass Kortright's negligent misrepresentation claim based on Investcorp's representations as to its willingness to proceed with the Man Transaction using only its clients' capital while omitting the need for client consent.  Kortright argues that this claim falls within the broad scope of the jury waiver provisions, relying on cases that interpret jury trial waivers of claims "relating to" a contract as encompassing related tort claims arising from the parties' contractual relationship.  Investcorp counters that the negligent misrepresentation claim does not strictly relate to the day-to-day operation and management of the Kortright fund and that a negligent misrepresentation claim arising out of discussions had in April 2016 regarding a prospective business transaction with a third party could not have been contemplated by the parties when negotiating the 2013 Project Agreement.

---

[4]     Section 5.14(c) of the RSA also contains a substantially similar jury waiver.  But based on the conclusion that the RSA never became a valid and effective contract, this Court need not consider the import of the RSA's jury waiver provision.

While mindful of its obligation to construe jury waiver provisions narrowly, this Court finds Investcorp's interpretation to be overly restrictive and belied by the plain language of the provisions.  Specifically, under those provisions, Kortright and Investcorp irrevocably waived their right to a jury trial with respect to (1) any claim (2) relating in any way to (3) the agreements or the operation of the Kortright fund.  Judges in this District have construed "relating to" as tantamount to having a connection, relation, or association with something.  See, e.g., Allied Irish Banks, plc v. Bank of Am., N.A., 875 F. Supp. 2d 352, 356-57 (S.D.N.Y. 2012) (citing Coregis Ins. Co. v. Am. Health Found., Inc., 241 F.3d 123, 128-29 (2d Cir. 2001)).  And in interpreting the term in the context of an insurance contract, the Second Circuit explained that the phrase "related to" is broader than "arising out of," and does not necessarily implicate a causal connection.  See Coregis Ins. Co., 241 F.3d at 128-29.

Kortright alleges that it entered into the Termination Agreement and Amended Termination Agreement solely because of the misrepresentations underlying its negligent misrepresentation claim.  (Proposed Amended Complaint ¶¶ 78-79.)  Such a claim is certainly connected or associated in some way with the formation of the Termination Agreement and the Amended Termination Agreement as to bring it within the purview of the language of their jury waiver provisions.  See Solutia Inc. v. FMC Corp., 456 F. Supp. 2d 429, 454 (S.D.N.Y. 2006); accord Efficient Sols., Inc. v. Meiners' Country Mart, Inc., 56 F. Supp. 2d 982, 984 (W.D. Tenn. 1999).  While sweeping in scope, this clear and unambiguous language cannot be overridden by Investcorp's conjecture that the parties could not have contemplated that the jury waiver provisions would apply to a negligent misrepresentation claim based on a prospective transaction with a third party.  See Tech. Support Servs., Inc. v. Int'l Bus. Machs. Corp., 856 N.Y.S.2d 26, 29 (N.Y. Sup. Ct. 2007) (citing Gunn v. Palmieri, 589 N.Y.S.2d 577, 577 (N.Y. App. Div. 1992))

(finding contractual jury waivers of disputes "in any way connected with" or "related to" the agreement as valid and unambiguous); cf. Slatt v. Slatt, 477 N.E.2d 1099, 1100 (N.Y. 1985) (cautioning that "courts may not fashion a new contract under the guise of contract construction," but must "discern the intent of the parties, to the extent that [the parties] evidenced what they intended by what they wrote" (citations and quotation marks omitted) (alteration in Slatt)).  Because the language employed by the jury waiver provisions reveals the parties' intent to waive their right to a jury trial as to any claim bearing any connection to the agreements, Kortright's motion to strike Investcorp's jury demand is granted.

III.    Motions for Sanctions

Each side seeks sanctions against the other.  Both requests are denied.

A.    Kortright's Request for Sanctions

Kortright seeks costs under this Court's inherent authority to punish abuse of the judicial process based on Investcorp's representations to Kortright, Man Group, and this Court that it did not proceed with the Man Transaction because it needed—but could not obtain—its own clients' consent.[5]  Kortright claims that these representations were false because Investcorp never needed or sought its clients' consent, and that its executives made the decision not to consent, unraveling the Man Transaction.  These alleged misrepresentations caused Kortright not to assert a claim for breach of the RSA and caused it to incur additional costs relating to discovery and this motion.

As an initial matter, Kortright characterizes the purportedly sanctionable conduct as representations that Investcorp "repeatedly" made over the course of this action, including in

---

[5]    A court's inherent power to impose sanctions "should be limited to cases where 'neither the [28 U.S.C. § 1927] nor the [Federal Rules of Civil Procedure] are up to the task.'"  In re Zyprexa Prods. Liab. Litig., 467 F. Supp. 2d 256, 271 (E.D.N.Y. 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 51 (1991)).  Kortright does not brief the applicability of sanctions under statute or Rule, and this Court assumes that none apply.

written submissions to this Court and during the March 2, 2017 oral argument.  (See Motion to

Amend, at 1-2, 24.)  But it does not cite to any specific portions of the record, and this Court

declines the invitation to sift through the record to ascertain which statements Kortright intended

to reference and when they were made.  Cf. Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.,

309 F.3d 433, 436 (7th Cir. 2002) (reiterating the principle that "'[j]udges are not like pigs,

hunting for truffles buried in' the record" (citation omitted)).  Consequently, the propriety of

sanctions will be determined based on specific conduct to which the parties directly refer.

    This Court cannot conclude that sanctions are warranted on this record.

Undoubtedly, a court has the inherent power to sanction a party for perpetrating a fraud on the

court.  See Almeciga v. Ctr. for Investigative Reporting, Inc., 185 F. Supp. 3d 401, 427

(S.D.N.Y. 2016).  But because of their "very potency, inherent powers must be exercised with

restraint and discretion," Chambers, 501 U.S. at 44, and sanctions are generally appropriate only

if a court finds by clear and convincing evidence that a party or attorney "knowingly [made] . . .

materially false or misleading [statements], or knowingly failed to correct false statements, as

part of a deliberate and unconscionable scheme to interfere with the Court's ability to adjudicate

the case fairly."  Almeciga, 185 F. Supp. 3d at 427 (quotation mark and citation omitted); see

also Romeo & Juliette Laser Hair Removal, Inc. v. Assara I, LLC, 924 F. Supp. 2d 505, 508

(S.D.N.Y. 2013).

    Similarly, while a court "may impose sanctions for misconduct during discovery

through [its] inherent power to manage its own affairs," it "should exercise this power with

restraint and only upon the finding of bad faith"—i.e., motivated by harassment, delay, or other

improper purposes.  Interscope Records v. Barbosa, 2007 WL 14332, at *3 (S.D.N.Y. Jan. 3,

2007).  Bad faith requires "clear evidence" that the challenged conduct is entirely without color

and taken for improper purposes, United States v. Int'l Bhd. of Teamsters, 948 F.2d 1338, 1345

(2d Cir. 1991), and a finding of bad faith "must be supported by a high degree of specificity in

the [court's] factual findings," Enmon, 675 F.3d 138, 143 (2d Cir. 2012) (citation and quotation

marks omitted).  Moreover, "bad faith may be inferred only if actions are so completely without

merit as to require the conclusion that they must have been undertaken for some improper

purpose." Enmon, 675 F.3d at 143 (quotation marks omitted).

               Here, the gossamer record supplied by Kortright counsels in favor of exercising

restraint, not judicial power.  While Kortright contends that Investcorp has made repeated

representations that turned out to be false, it presents little evidence—much less clear and

convincing evidence—from which this Court may infer that Investcorp or its counsel knowingly

made those misrepresentations as part of a scheme to tamper with the fair adjudication of this

action.  Nor has Kortright made a clear and particularized showing of bad faith.  See McCune v.

Rugged Entm't, LLC, 2010 WL 1189390, at *4 (E.D.N.Y. Mar. 29, 2010) ("[T]he bad faith

standard is not easily satisfied and sanctions are warranted only in extreme cases.").  It has not,

for example, come forth with "clear and convincing evidence that [Investcorp's] conduct was not

merely negligent but was undertaken with subjective bad faith."  See SEC v. Smith, 798 F. Supp.

2d 412, 422 (N.D.N.Y. 2011) (emphasis added) (adding that consideration must not be limited to

the "objective truthfulness of the statements in question").  Indeed, Investcorp's counsel's July

2017 disclosure that none of Investcorp's clients were involved with its decision to redeem client

capital—months before Kortright claims it unearthed the truth—undercuts an inference of bad

faith.  (See Declaration of Peter M. Wade in Support of Defendant Investcorp's Omnibus

Memorandum of Law in Opposition to Plaintiffs' Motions to Amend the Complaint and to Strike

Investcorp's Demand for Trial by Jury, ECF No. 72, Ex. F.)  Thus, in this Court's view and

based on the record presented, sanctions against Investcorp are unwarranted.

      B.  <u>Investcorp's Request for Sanctions</u>

           Not to be outdone, Investcorp counters in its opposition brief that if sanctions should be imposed on anyone, it should be Kortright for its "many frivolous and deceitful arguments . . . in support of" baseless claims.  (<u>See</u> Omnibus Memorandum of Law in Opposition to Plaintiffs' Motions to Amend the Complaint and to Strike Investcorp's Demand for Trial by Jury, ECF No. 71, at *18.)  While somewhat cryptic, Investcorp appears to premise its request on Rule 11 of the Federal Rules of Civil Procedure.  However, Rule 11 requires that a sanctions motion "be made separately from any other motion and . . . describe the specific conduct that allegedly violates Rule 11(b)."  Fed. R. Civ. P. 11(c)(2); <u>Williamson v. Recovery Ltd. P'ship</u>, 542 F.3d 43, 51-52 (2d Cir. 2008) (affirming district court's denial of defendants' request for attorney's fees, costs, and damages because defendants "failed to make a separate motion for sanctions under Rule 11").  In particular, courts in this Circuit have rejected requests for Rule 11 sanctions made in opposition briefs as procedurally defective.  <u>See, e.g.</u>, <u>In re Bridge Const. Servs. of Fla., Inc.</u>, 140 F. Supp. 3d 324, 332-33 (S.D.N.Y. 2015); <u>Tardd v. Brookhaven Nat'l Lab.</u>, 407 F. Supp. 2d 404, 421 (E.D.N.Y. 2006).

           But even if Investcorp had complied with Rule 11's dictates, sanctions would be unwarranted.  "An argument constitutes a frivolous legal position for purposes of Rule 11 sanctions if, under an objective standard of reasonableness, it is clear . . . that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands."  <u>Morley v. Ciba-Geigy Corp.</u>, 66 F.3d 21, 25 (2d Cir. 1995) (citation and quotation marks omitted) (ellipses in original).  Moreover, "[t]he fact that a legal theory is a long-shot does not necessarily mean it is sanctionable."  <u>Fishoff v. Coty Inc.</u>, 634 F.3d 647, 654 (2d Cir. 2011).  On

the whole, Kortright advanced colorable arguments relating to the validity and effectiveness of the RSA.  That they were ultimately unsuccessful does not render them objectively unreasonable or clearly frivolous.[6]  Accordingly, Investcorp's request for sanctions is denied.

CONCLUSION

For the foregoing reasons, Kortright's motion to amend is denied, and its motion to strike Investcorp's jury demand is granted.  Kortright and Investcorp's requests for sanctions are denied.  The Clerk of Court is directed to terminate the motions pending at ECF Nos. 63 and 66.

Dated: August 13, 2018
         New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

---

[6]      Nor would sanctions under this Court's inherent authority be appropriate.  Even assuming that Kortright's "legal arguments were entirely without a legal or factual basis, the Court would still be required to find that [Kortright] acted in bad faith in order to impose sanctions under its inherent authority."  ED Capital, LLC v. Bloomfield Inv. Res. Corp., 316 F.R.D. 77, 83 (S.D.N.Y. 2016).  The generalized characterization of Kortright's arguments as frivolous—notwithstanding their lack of persuasiveness—is insufficient standing alone for a finding of bad faith.  See ED Capital, LLC, 316 F.R.D. at 83 ("Without more specific examples of bad faith or an improper course of conduct, general characterizations of groundless claims are insufficient to find that [plaintiff] engaged in sanctionable conduct.").