# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
Case No. 16 CV 7619

- - - - - - - - - - - - - - - - - - - - -x

KORTRIGHT CAPITAL PARTNERS LP,
MATTHEW TAYLOR AND TY POPPLEWELL,

Plaintiffs,

-against-

INVESTCORP INVESTMENT ADVISORS LIMITED,

Defendant.

- - - - - - - - - - - - - - - - - - - - -x

200 Liberty Street
New York, New York
March 8, 2018
9:20 a.m.

*** CONFIDENTIAL ***

VIDEOTAPED DEPOSITION of HENRY KLEIN, an Expert Witness in the above-entitled action, held at the above time and place, taken before Dawn Matera, a Shorthand Reporter and Notary Public of the State of New York.

* * *

Q. Yeah, I am sorry, I was actually referring to other portions of your report where you categorize, you talk about agreements "Agreements comparable to the revenue sharing agreement." You call them "Common in the investment management industry." And you opine on whether or not the revenue sharing agreement would make sense as a matter of industry practice.

So that leads me to believe that you, at least, think that you have experience in the industry that would allow you to opine on the revenue sharing agreement?

MR. STANISCI: Is that in the same paragraph?

MR. WADE: No. That was from paragraph, it's from the same section, paragraph 96.

A. 96. So I am sorry, did you actually read what I wrote?

Q. I did.

A. Is that what you did?

Q. I did.

A. Thank you. I think there was a second part of the sentence that I am not sure, perhaps I'm misremembering. It says "The purpose of these agreements is to permit an investor to obtain special benefits in exchange for, among other things, an investment in the Fund. In this case, as a matter of industry practice, the revenue sharing agreement would not make sense in the absence of an understanding and intent that the Investcorp clients' capital would remain invested through the closing of the Man transaction."

Q. Okay. My question is: Based on your experience in the industry and with, based on your experience with industry practice, when you read the revenue sharing agreement, do you disagree with the statement that the revenue sharing agreement did not impose legal restrictions on Investcorp's ability to withdraw its investors' capital? I am not asking for a legal opinion.

A. I don't think that the revenue sharing agreement explicitly dealt with this issue other than it didn't make sense in the context of how this process had evolved.

Q. When you say "this issue," are you referring to the redemption of Investcorp's client capital?

A. I am referring to the fact that it wouldn't have made sense in the absence of an understanding of that.

Q. With respect, that's not what I'm asking about.

I am asking about whether or not its revenue sharing agreement imposed a restriction on Investcorp's ability to withdraw its investors' capital from the Kortright Funds?

A. I believe that it had certain thresholds built into it that anticipated, to the extent that Investcorp withdrew client capital over time, some of the revenue share would be lost. But the client capital would be subject to the typical redemption

provisions that existed in another document.

Q. And even in the context of those thresholds, Investcorp could choose whether or not to redeem that capital and trigger those thresholds, right?

A. In the context of those thresholds, yes.

Q. In other words, there was nothing, there is nothing in the revenue sharing agreement that prevents Investcorp from triggering those thresholds?

A. Not that I am aware of.

Q. Okay. And in the event that those thresholds are triggered, that would not be considered a breach of the revenue sharing agreement, in your understanding; is that right?

MR. STANISCI: Object, to the extent you're seeking a legal conclusion.

A. You know, I don't know.

My understanding of the business arrangement was that the revenue

I am not suggesting by saying what I have here that one would necessarily not. I think, for example, were this performance occurring during a period of absolute market calm when all other funds were making money, that would be different than what was actually happening and a meaningful difference.

Q. But if, in fact, Kortright was, even during this exceptionally challenging period, still underperforming the relevant benchmarks, that wouldn't be irrelevant to an investor, would it?

MR. STANISCI: Object to form.

A. Investors decide what factors are more important to them in making the decisions. There's hundreds and hundreds of different considerations that different investors will weight differently.

Q. So if Kortright underperformed in the first quarter of 2016 each of the relevant benchmark indices that we've been discussing, would you agree that that might be a reason for an investor to

be concerned?

MR. STANISCI: Object to the form.

A. Like I said, an investor can choose to be concerned over whichever factors they considered to be most important.

So to the extent that in a period of great volatility in the market, an investor looks at that performance relative to, say, the five prior years -- sorry, the six prior years of track record, and wants to weight that at greater importance than some other investor may weight it, that's up to their discretion.

Q. Okay. And if -- if in the second quarter of 2016, the benchmark indices indicated that the market was recovering and those indices actually turned positive, would it be reasonable for an investor to be concerned if Kortright continued to lose money?

MR. STANISCI: Object to the form.

A. You know, I think the thing, as an investment professional, that's important, at least from my perspective to understand, is we're picking arbitrary periods of time, one month intervals.

So when one thinks of an index and whether a fund is tracking that index, what's relevant is really the performance over a long period of time. And month to month, there is no real reason to think that a fund is going to consistently outperform month to month.

As I said in my report, part of the price that one pays for an actively managed portfolio is that one will have periods of underperformance. And we're arbitrarily selecting one month measurement periods in exchange for periods of outperformance, and that was the history of this fund.

Q. Sure. And I am not trying to be difficult or to belabor the point, but this is the difficulty that I am having, is we keep going back and forth. On the one hand, you just referred to shorter

was somehow unreasonable for Investcorp to make a redemption decision based on the fact that the Funds had continued to underperform after April?

A. I am -- I said it so many times, that I consider an investor able to choose whatever reasons they want to withdraw from a fund or to redeem from a fund.

But it's my opinion that the reasons that are being pointed to, in this particular instance, which is a deterioration of performance after April that was material and unusual relative to the history of this Fund, is not accurate.

Q. We will leave aside whether or not any Investcorp witnesses actually testified to that.

But it sounds to me that what you're saying is that the factors that would be material to a decision to redeem would be determined by Investcorp, correct?

A. Yes, I've said that.

Q. So what is your basis for opining on whether between April and June 2016, there was any new information that was material to a decision to redeem, if, in fact, that determination is up to Investcorp?

A. Well, as I've said, I think investors can change what they decide is material. They change their view of what is material. And they can elevate certain factors. But looking at the record, my opinion is that the factors that are being pointed to, which is the style drift, the investment guidelines, the non-repeatability of performance, were nothing new between April and June. And I don't think the performance between April and June was particularly exceptional relative to other periods in the history of the Fund.

So to my mind, those are not the reasons, unless Investcorp is saying those things didn't really change, but we changed the way that we weighted them.

MR. STANISCI: I think we've

been going around an hour, so whenever there is a good time to break.

MR. WADE: Now is a good time.

THE VIDEOGRAPHER: The time on the video monitor is 4:01 p.m. We are off the record.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record. The time on the video monitor is 4:21 p.m. This starts media 5.

Q. All right. Mr. Klein, before we go forward, I just want to confirm, we talked about your reaction to Mr. Savoldelli's analysis of Kortright's breaches of risk guidelines.

Have you done any other analyses or conducted any other research in response to anything else in Mr. Savoldelli's opening report?

A. I mean, I read the report and have views on some of his opinions, but I don't think there is any specific like the -- the specific table that he put in his report that I looked at and thought

So that always struck me as a major problem with what was contemplated here.

Q. Anything else?

A. Well, I think, and I've experienced this, in organizations, perhaps Investcorp looked, looked at the Fund in April, and Mr. Vamvakas said that he ran it up the flag pole.

I don't know how high up the flag pole he ran it. Maybe he didn't. Maybe he was out over his skis and really wasn't authorized to, you know, to progress this transaction, and maybe when the organization focused on the situation at hand, they made a different decision, but perhaps might have made the same decision had they focused and run it all the way up the flag pole in April.

Q. And that decision that was made by the organization, do you have an understanding of why that decision was made -- withdrawn.

If the second scenario that you posited was true, do you have any

understanding or opinion as to why the
decision to redeem in June 2016 was made?
A. Well, I think if the decision
in June to redeem the capital was because
Investcorp had decided that the Fund was
no longer appropriate for an investment
by its clients or an allocation that it
was managing, if that's what happened, I
think, as I pointed out in my report,
there was nothing material that had
changed between April and June, that had
they focused on the same considerations,
that they would likely have reached a
different conclusion.
Q. And had they considered that --
had they focused on the same
considerations in April, do you think
they would have decided to redeem?
MR. STANISCI: Objection to
form.
A. June is a different time than
April, obviously. So it's not possible
for me to say what they would have done.
But that is one possible explanation in
the absence of a material change in the

facts between April and June, why the same organization might make a different decision.

Q. And if they, if the organization had considered it in April, and had made the decision that, as I think you put it, investment in the portfolio was no longer appropriate for its clients, based on your review of the evidence in this case, do you think that would have been an inappropriate decision for them to have made in April of 2016?

A. What do you mean by "inappropriate"?

Q. Do you think there would have been, you know -- based on your experience in the investment management industry and based on your interactions with investors in different types of investments, do you think that there would have been reasonable grounds for them to have made that determination as of April of 2016?

MR. STANISCI: Object to form.

A. Look, I think I've said that a

manager like Investcorp can conclude to invest or redeem at their discretion.

And so in that sense, if an analysis that they had done in April had led them to decide to redeem, I think that that's something that they could have done. And I expect they would have told Mr. Taylor that they didn't want alternative A, and Mr. Vamvakas acknowledged that the Kortright team could go to Man and manage an allocation.

So presumably, that's the path that they would have pursued if that had happened.

Q. And you reviewed the analysis that they did in June, right, the June 22nd attribution report?

A. Investcorp's analysis?

Q. Yes.

A. Yes.

Q. If that exact same report and analysis had been done at the beginning of April 2016, do you think that that report would have been a reasonable basis for an investment manager to conclude

that the investment in the Kortright Funds was no longer appropriate for its clients?

A. Look, I don't know how many ways I could say the same thing, which is that, in my view, an investment manager can rely on whatever they choose to make a decision to investment. And if they make bad decisions consistently, ultimately their clients will not give them discretion to make those decisions. That's just how the market works.

But all different investors use different metrics and different processes to make decisions about investments. And that's why people reach different conclusions.

Q. So you can't say, based on your 25 years in the industry, one way or the other, whether or not that decision would have made sense to you in April 2016?

MR. STANISCI: Objection to form.

A. The decision makes sense in the sense that it's up to an investor to

remained static for the remainder of 2016 and into 2017, specifically June 30th, 2017, the returns before fees would have been approximately 35 percent to Kortright?
A. Yes, to the Fund.
Q. How did you conduct this analysis?
A. So we took the portfolio at, I am trying to see which date it was, starting on June 30th, keeping the portfolio as is, in other words, no changes. And just measuring the performance.
Q. Did it take into account both the long and short positions in Kortright's portfolio?
A. I don't remember, off the top of my head.
Q. How would we determine that?
A. I believe so, but I am not absolutely sure.
Q. Did you conduct this analysis?
A. Cornerstone did support me in helping to create this analysis. But I

did review it.

Q. Okay. Did you review the methodology that they used to conduct it?

A. I believe we shared the Excel spreadsheet.

Q. Okay. Do you know if this analysis takes into account whether the Funds could have actually achieved these returns and remained compliant with all applicable portfolio limits?

A. No. I don't think we did that. This was just intended as an illustration.

Q. Does it seem feasible to you that the Funds could have achieved 35 percent growth in the next year and remained -- while keeping the portfolio static, and also remained compliant with portfolio limits?

A. This is a hypothetical analysis, obviously. And I think I'm clear on that.

So to assume the portfolio is static is the only thing that one can do. There is no way to know what the managers

may have chosen to do.

But had that resulted in them being out of compliance with risk guidelines, then presumably they would have made adjustments to the portfolio.

So it's a somewhat artificial analysis. It's all things being equal, it would be reasonable to assume that the managers would add value to a static portfolio by virtue of the decisions they would make and were just assuming that that was not the case, that they were not, there is no other way for me to predict what they may or may not have done.

Q. I understand it's a hypothetical point.

I am trying to actually understand the context around how I should read it.

So just back to my question: Does it seem feasible to you that the Funds could have kept a static portfolio for a year, achieved 35 percent growth and not breached applicable portfolio

limits?

MR. STANISCI: Object to the form.

A. I don't know.

Q. Okay. Does it seem feasible to you -- well, withdrawn.

How likely would it be that Kortright's portfolio would remain static over the year following June 30th, 2016?

A. Very unlikely.

Q. Okay. And so there likely would have been turnover in the Fund, correct?

A. That's what a manager gets paid to do, is make investment decisions.

Q. All right. And those investment decisions could have done better or worse than this 35 percent number; is that right?

A. Well, they could have added to it or subtracted from it. It's possible.

Q. Okay. Going back to the portfolio limits point, if keeping a static portfolio and achieving 35 percent -- sorry, withdrawn.

much you have.

THE WITNESS: I am happy to keep going.

MR. WADE: Why don't we just keep going a little bit longer and see how long it takes us to go through this.

THE WITNESS: Sure.

MR. STANISCI: If you need a break at any time, just let us know.

Q. I want to turn to paragraph 78 of your report. And this is the first paragraph of Section H titled Performance in the Second Quarter May Have Been Negatively Impacted By Investcorp's Withdrawal of Proprietary and Client Funds.

A. Yes.

Q. So that phrase in the title "May Have Been," that kind of language is generally used throughout this section. And I'll invite you to review it to refresh your recollection, but you use a lot of qualifying phrases like may have, would have likely, could have been.

So I just wanted to ask you a couple of clarifying questions.

Can you say, one way or the other, whether Investcorp's redemption of client capital did, in fact, negatively affect Kortright's performance in May or June 2016?

A. Well, client capital was only redeemed after, in late June. So it couldn't have affected performance in May.

Q. Okay.

A. So do you want to --

Q. I said May or June. So you've answered the May part.

Can you say, one way or the other, whether Investcorp's redemption of client capital did, in fact, negatively affect Kortright's performance in June of 2016?

A. Well, I think throughout the section, I think you cannot say definitively. And I think Mr. Savoldelli uses the word likely.

His view is it likely did not.

But I think what's relevant here is these are small-cap relatively illiquid companies. I am sorry.

Q. Don't apologize.

Are you done?

A. And so on the margin, any liquidation is going to negatively impact the trading prices of the stocks.

The extent to which that impacts -- the extent of that impact would really depend on a case by case basis, how much liquidity there is in the name, how many market makers, how much awareness there is in the business of a wind-down of a hedge fund.

I can tell you that when I worked at Lehman, when we became aware of a hedge fund that was in unwind, we were looking for trading opportunities to take advantage of that dynamic.

Q. And so just so I understand, though, and we're running kinds of short on time, so I really just want to cabin these questions to Kortright and to your opinions.

read that correctly into the record.

On page 29 of your report, you include a section titled The Market's Likely Interpretation of Investcorp's Actions.

Have you conducted any analysis to quantify how likely it is that an investor would interpret Investcorp's actions in the manner that you describe in this section?

A. I don't think there is an analysis that can be done. I think it's based on my experience marketing funds that are similar to hedge funds to institutions and being familiar with the kind of considerations that institutions are concerned about.

Q. Have you reviewed or do you have any evidence that any investor has interpreted Investcorp's actions in the manner that you describe in your report?

MR. STANISCI: Object to the form.

A. When you say an investor, you mean what?

Q. Any potential, actual or potential investor in the market that would --

MR. STANISCI: Investor in the Kortright Funds. I think that might be his issue.

Q. Let's change investor to market participant.

Do you have any evidence that any market participant has actually interpreted Investcorp's actions in the manner that you describe in this section of your report?

A. Well, I think that would only be evident if the Kortright principals sought to raise capital, because otherwise it's not something that would likely have been considered.

Q. And based on your understanding, have the Kortright principals not sought to raise capital?

A. I don't know whether they have or haven't.

Q. Okay. So you don't know, one way or the other, whether or not any

market participant has actually interpreted Investcorp's actions in the manner that you describe in this section of your report?

A. I believe that were Kortright -- the Kortright principals to seek to raise money, which I am not aware of whether they did or not, that market participants, that this would be a problem for market participants.

Q. All right. And when you say "this would be a problem," what do you mean?

A. Well, when Investcorp made the decision to seed Kortright, they did reference checks with all nine of Matt Taylor's prior employers, and considered factors like worth ethic, like ability, intelligence, qualitative factors.

And in this particular instance, if somebody looked at the history of the Kortright principals, they were seeded by Investcorp, the parties agreed to change that relationship by transferring -- and Man was willing to

back the Kortright principals, there was a reason for Man to want the transaction to proceed. There was a reason for the Kortright principals to want the transaction to proceed. And there was a reason for the Investcorp, for Investcorp to want the transaction to proceed. In fact, the transaction essentially did proceed because everyone executed the documents and then the Fund blew up.

So Investcorp apparently fabricated a reason as an explanation for their decision, that they've subsequently acknowledged was not the actual reason. So from Man's perspective, that's frankly inexplicable behavior.

And as I point out in my report, professional investors do get paid to take, to evaluate and take risks that they can make informed judgments about.

But the reason for Investcorp doing what they did after engaging around a transaction the way they did, there is no simple explanation that I think would

to have any proprietary investment at all in the Funds once they transitioned to Man, right?

MR. STANISCI: Object to the form.

A. That's right.

Q. So the only funds that would have gone over would have been Investcorp's third-party clients, right?

A. That was the plan that was agreed in April.

Q. Okay. So since that is the case, how is an exterior market professional likely to take Investcorp's redemption of those third-party clients' capital as, in essence, a signal that Investcorp, as a strategic partner, no longer believed in Kortright?

A. Well, Investcorp redeemed its own -- redeemed its proprietary capital.

Q. So was that act, in and of itself, one of the negative signals that you're talking about in this part of your report?

A. No, for a couple of reasons.

[redacted]

And the other consideration is that that is understandable, that Investcorp wouldn't necessarily want to use its proprietary capital to, in effect, help seed a fund at another investment management firm.

Q. Along those same lines, would the market -- withdrawn.

But is it likely that when a manager leaves a seed investor to go to one of those seed investor's competitors, is it likely or typical that the original seed investor's clients' moneys follows that manager?

MR. STANISCI: Object to the form.

A. So I am not sure it's something that happens all that often, but the

point is that Man understood why the proprietary capital was being withdrawn. It was no problem for Man. Because it's logical and explainable why Investcorp chose to do that. It makes sense.

The June redemption made no sense. And as I've pointed out in my report, on the brink of a fragile decision, an inexplicable event that doesn't make any sense is enough to tip the balance for somebody about to proceed.

Q. And when you talk about "the brink of a fragile decision," are you talking about Man and the Man transaction?

A. Well, Man had already committed to the transaction, and just needed it to close in order for the general partner and investment management -- the investment management entity -- the investment management contract to be transferred to Man entities. So Man was committed. But in the context of perhaps Man considering some alternative path, at