UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- :

KORTRIGHT CAPITAL PARTNERS :  
LP, MATTHEW TAYLOR, and TY :  
POPPLEWELL, :  
  : 16cv7619
           Plaintiffs, :  
  : <u>OPINION & ORDER</u>
     -against- :  
  :  
INVESTCORP INVESTMENT ADVISERS :  
LIMITED, :  
  :  
         Defendant. :  

-------------------------------------------------------------- :

WILLIAM H. PAULEY III, Senior United States District Judge:

        Plaintiffs Kortright Capital Partners LP ("Kortright") and its co-founders Matthew

Taylor and Ty Popplewell bring this diversity action against Investcorp Investment Advisers

Limited (together with various affiliates, "Investcorp"). Broadly speaking, Plaintiffs allege that

Investcorp—a longtime seed investor in funds operated by Kortright—induced them to proceed

with a multi-million-dollar transaction with a competitor of Investcorp's, which depended on

Investcorp's consent and participation. Although Investcorp purportedly promised to support the

transaction, Plaintiffs claim that Investcorp reneged at the last moment—mere days before the

closing date of the transaction.

        In the wake of the transaction's implosion, Plaintiffs brought an assortment of

New York common law claims for negligent misrepresentation, negligence, breach of contract,

breach of the implied covenant of good faith and fair dealing, and promissory estoppel. (<u>See</u>

Complaint, ECF No. 1 ("Compl.").) Only Plaintiffs' negligent misrepresentation claim survived

Investcorp's motion to dismiss and subsequent motion for summary judgment. <u>See</u> <u>Kortright</u>

Capital Partners LP v. Investcorp Inv. Advisers Ltd., 2018 WL 6329396 (S.D.N.Y. Dec. 4, 2018) (summary judgment); Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd., 257 F. Supp. 3d 348 (S.D.N.Y. 2017) (motion to dismiss).

Following a bench trial on the negligent misrepresentation claim, this Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. This Opinion & Order also addresses the parties' motions to preclude the expert testimony of their respective damages and industry experts. (See Trial Tr. at 640.) Finally, this Court calculates the fees to be awarded Plaintiffs for Investcorp's discovery misconduct. See Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd., 330 F.R.D. 134, 140 (S.D.N.Y. 2019).

BACKGROUND

I.      The Investcorp Seeding Relationship

Roughly a decade ago, Taylor and Popplewell—two investment professionals who had worked together for years at Och-Ziff Capital Management and Barclays—formed Kortright. (Trial Tr. at 40-42 (Taylor).) Kortright was an investment adviser for a series of hedge funds that began managing money for clients in May 2010. (Trial Tr. at 43 (Taylor).) In general, Kortright employed a hybrid strategy between event-driven investing and long-term value investing. (Trial Tr. at 43-45 (Taylor); Trial Tr. at 1223-24 (Popplewell).) After forming Kortright, Plaintiffs planned to develop its track record for a few years under a joint venture structure with its original seed funder before seeking a new seeding arrangement that would eventually enable Kortright to stand on its own as an asset manager. (Trial Tr. at 45-46 (Taylor).)

In 2013, Plaintiffs embarked on their search for a new seeding partner. One of

Kortright's potential suitors was Investcorp, an alternative asset manager that offered its clients the opportunity to invest in hedge funds and other products. (Trial Tr. at 803-04 (Vamvakas).) As relevant here, one of Investcorp's businesses—its single manager platform—involved identifying hedge fund managers and providing them with seed capital to grow their assets in return for a revenue share. (Trial Tr. at 645, 803-07 (Vamvakas); Trial Tr. at 995 (Erdely).) Investcorp would also monitor the performance of the managers in real time. (Trial Tr. at 997-99 (Erdely).) Once the contractual commitment period lapsed, Investcorp typically redeemed that capital in order to seed additional fund managers. (Trial Tr. at 665, 807-08 (Vamvakas); Trial Tr. at 996 (Erdely).)

Between the spring and summer of 2013, Kortright and Investcorp negotiated a seeding relationship and each conducted due diligence on the other. (Trial Tr. at 47-48 (Taylor); Trial Tr. at 645 (Vamvakas).) Investcorp's risk committee approved an investment in Kortright, touting the Kortright team's talent, track record, and reputation. (Trial Tr. at 647-50 (Vamvakas); see P-9.) The parties' efforts culminated in a Project Agreement executed on June 26, 2013. (See P-11.) In broad strokes, the Project Agreement provided for up to a $50 million investment of Investcorp's clients' capital subject to the funds' liquidity provisions—namely, that Investcorp could redeem its investment if it provided notice of redemption at least 45 days before the end of each quarter. (Trial Tr. at 53, 72-73 (Taylor).) Under the Project Agreement, the investment of client capital was subject to a "fiduciary reasonable best efforts" clause, which meant that the capital would be subject to Investcorp acting in what it reasonably believed to be its clients' best interests. (Trial Tr. at 249-52 (Taylor); Trial Tr. at 814-15 (Vamvakas).) Investcorp also agreed to invest $50 million of proprietary capital from its balance sheet subject both to the general liquidity provisions as well as a two-year lockup period. (Trial Tr. at 51-53

(Taylor); Trial Tr. at 1225-26 (Popplewell); Trial Tr. at 664-65 (Vamvakas).)

In exchange for Investcorp's seed funding, the Project Agreement afforded Investcorp a bevy of consent, informational, and economic rights.  (Accord Trial Tr. at 1177, 1179-80 (Klein) (explaining the nature of seeding relationships generally).)  For example, Investcorp had the right to consent to any mergers, sales, joint ventures, changes in Kortright's structure, or changes in control.  (Trial Tr. at 54 (Taylor); see P-11, § 2.1.)  The Project Agreement also entitled Investcorp to receive notice of various events and to inspect Kortright's financial statements and valuations.  (Trial Tr. at 55-56 (Taylor); see P-11, §§ 2.2, 2.3, 2.5.)  And in particular, Investcorp had the right to receive a revenue share at different levels of Kortright's growth, based on its assets under management.  (Trial Tr. at 56-57 (Taylor); see P-11, § 3.2.)  Throughout the life of Kortright's relationship with Investcorp, Plaintiffs primarily interfaced with Nick Vamvakas, the head of Investcorp's single manager platform business.  (Trial Tr. at 47-48 (Taylor); Trial Tr. at 644-45, 800 (Vamvakas).)  In addition, Plaintiffs periodically communicated with Investcorp's research analysts about the specifics of the portfolios.  (Trial Tr. at 818 (Vamvakas).)

## II.  The Man Opportunity

Between 2011 and 2015, Kortright's annual profits grew from roughly $1 million to approximately $5 million.  (Trial Tr. at 242 (Taylor).)  Although the relationship with Investcorp enabled Kortright to raise assets and attract clients, Taylor and Popplewell were dissatisfied with the rate of Kortright's growth.  As part of the seed investor arrangement, Investcorp had agreed to serve as a placement agent for the Kortright funds pursuant to a marketing agreement between the parties.  (See P-12.)  Plaintiffs believed that Investcorp could leverage its "robust" marketing team and connections in the hedge fund industry to promote

Kortright and raise funds.  (Trial Tr. at 69 (Taylor).)  However, shortly after Kortright and

Investcorp began their relationship, Investcorp's marketing department downsized from five or

six people to a single person.  (Trial Tr. at 70 (Taylor).)  And because this coincided precisely

with the period in which Kortright needed to grow, Taylor and Popplewell fell short of their

growth goals.  (Trial Tr. at 73-74 (Taylor).)

        In the summer of 2015, Taylor began discussing a potential business opportunity

with Man Group plc ("Man"), an asset management company based in the United Kingdom.

(Trial Tr. at 89-92 (Taylor); Trial Tr. at 424 (Jones).)  Although Man sent over proposed terms at

that time in contemplation of a potential transaction, these exploratory discussions did not result

in any agreement with Man at that time.  Despite Plaintiffs' growing frustrations with

Investcorp's marketing of the Kortright funds, Taylor still perceived Investcorp to be committed

to the partnership, and Kortright had a few prospective clients that it hoped to bring on board.

(Trial Tr. at 92-93 (Taylor).)

        By the end of 2015, two developments caused Taylor to revisit Kortright's earlier

discussions with Man.  First, Investcorp made a redemption request for a portion of its

proprietary capital for year-end 2015, possibly signaling a shriveling commitment to Kortright.

(Trial Tr. at 95-97 (Taylor); Trial Tr. at 822-23 (Vamvakas); Trial Tr. at 1236 (Popplewell); see

also P-53.)  Second, the prospective clients that Kortright wooed during the summer failed to

materialize by the end of the year.  (Trial Tr. at 95-96 (Taylor).)  These circumstances gave rise

to Taylor's concerns that the withdrawal of capital by Investcorp—Kortright's strategic

investor—could spook potential clients from investing in Kortright.

        Based on lingering doubts over Investcorp's continuing commitment to Kortright,

Taylor rekindled discussions with Man in December 2015.  Man sent Taylor an indicative

proposal that month. This proposal carried the same general structure as the proposal Plaintiffs considered in the summer of 2015 and eventually became the template for the Man transaction. (Trial Tr. at 278-79 (Taylor); see D-5.) Things came to a head in February 2016. The catalyst was Investcorp's submission of redemption notices for a substantial portion of its proprietary capital for March 31, 2016. (Trial Tr. at 102-04 (Taylor); see also P-71; P-76.) Intensified discussions between Taylor and Man occurred in February and March 2016, eventually crystallizing into two possible structures for the contemplated transaction as reflected in a final indicative proposal on March 30, 2016. (See Trial Tr. at 108-17 (Taylor); see also P-108.) The first option contemplated a transition of the existing Kortright funds to Man and for Taylor and Popplewell to manage those funds as well as additional funds to be allocated by Man. Taylor and Popplewell understood the second option to provide for the Kortright funds to be wound down and for them to join Man as employees.[1] (See Trial Tr. at 116 (Taylor); Trial Tr. at 1235 (Popplewell).) Although Option A—in contrast to Option B—required Investcorp's formal consent as a contractual matter, both Man and Plaintiffs preferred Option A. (Trial Tr. at 114-16 (Taylor); Trial Tr. at 1235-37 (Popplewell).)

Investcorp first learned about a contemplated transaction between Kortright and Man in April 2016. (Trial Tr. at 668, 824 (Vamvakas).) At a business lunch on April 4, 2016, Taylor informed Vamvakas of Plaintiffs' concerns over Investcorp's commitment to Kortright and the implications for Kortright's growth and viability. (Trial Tr. at 119-20 (Taylor).) Taylor

---

[1] This Opinion & Order refers to the first option and second option as "Option A" and "Option B," respectively. Notably, Investcorp points to an apparent discrepancy between Plaintiffs' understanding of these potential options and Man's contemporaneous understanding—namely, that no scenario existed in which Man would solely hire Taylor and Popplewell as employees. For example, Mark Jones—an executive of a Man subsidiary—testified that Option B entailed creating a new Kortright fund at Man with Kortright's investors. (Trial Tr. at 1128, 1141 (Jones); see also Trial Tr. at 1094 (Jones).) In addition, a June 28, 2016 email by Jonathan Sorrell—another Man decision-maker—reflects his understanding that the transaction was "always predicated on . . . bringing a fund over." (D-70.)

stated that he and Popplewell were going to join Man and move on, but that Plaintiffs and Investcorp had an opportunity to continue an economic relationship. (Trial Tr. at 671, 824 (Vamvakas).) Taylor outlined Option A and Option B, explaining that Plaintiffs preferred Option A—that is, with Investcorp's participation. (Trial Tr. at 120 (Taylor); see also Trial Tr. at 671 (Vamvakas).) In substance, Vamvakas agreed that Option A was preferable and represented that although he could not speak for Investcorp at that lunch, he would "run it up the flagpole." (Trial Tr. at 121-23 (Taylor); Trial Tr. at 669 (Vamvakas).)

That afternoon, Vamvakas relayed his conversation with Taylor to Lionel Erdely, the chief investment officer of the Investcorp division that oversaw its single manager platform. (Trial Tr. at 673, 678 (Vamvakas); Trial Tr. at 881-82, 993, 1015 (Erdely).) At the end of the April 4 lunch, Taylor had asked Vamvakas to relay Erdely's response as soon as he could. (Trial Tr. at 123 (Taylor).) Erdely authorized Vamvakas to continue exploring the proposal with Taylor, but not to make any promise or commitment to him. (Trial Tr. at 826-27 (Vamvakas); Trial Tr. at 947, 1021-22 (Erdely).) On the whole, Taylor felt optimistic about Option A, perceiving Vamvakas to be genuinely pleased about the potential opportunity with Man. (Trial Tr. at 121-24 (Taylor); P-112 (email from Taylor to Man reporting that Option A "should be very workable").)

Over the next couple days, Vamvakas and Taylor continued to discuss the contours of a proposed transaction with Man as it related to the Kortright-Investcorp relationship. On April 6, 2016, Vamvakas, Taylor, and Popplewell held a follow-up telephone call. (Trial Tr. at 127 (Taylor); Trial Tr. at 676-77, 827 (Vamvakas); Trial Tr. at 1239 (Popplewell).) Vamvakas relayed that others at Investcorp with whom Vamvakas spoke preferred to pursue Option A. (Trial Tr. at 127 (Taylor); Trial Tr. at 1239-40 (Popplewell).) Selecting Option A

meant that the parties needed to terminate the Project Agreement, to which Investcorp assented. (Trial Tr. at 134, 304 (Taylor).) The parties also began to flesh out the broad commercial terms for the transaction, including a contemplated revenue share for Investcorp, a schedule for Investcorp to receive a revenue share post-closing, and the concept of a defined prospect list.[2] (Trial Tr. at 128-34 (Taylor); Trial Tr. at 1240 (Popplewell); accord Trial Tr. at 827 (Vamvakas).)

When it comes to the parties' discussion of Investcorp's participation[3]—that is, the core of Plaintiffs' negligent misrepresentation claim—their recollections are reminiscent of Rashomon. According to Taylor, Vamvakas relayed that Investcorp would consent to and participate in the contemplated transaction, that it would redeem its proprietary capital, and that it would leave its clients' capital invested through the transaction's closing. (Trial Tr. at 127-28, 131-32 (Taylor).) Similarly, Popplewell recalls Vamvakas reiterating that Investcorp's proprietary capital could not stay in the fund and would be redeemed, while client capital would remain invested. (Trial Tr. at 1239-42 (Popplewell).) Taylor and Popplewell also remember Taylor informing Vamvakas that Option A was premised on bringing over a commercially viable fund to Man such that the redemption of proprietary capital would functionally require client capital to remain invested, and that such client capital needed to remain invested through closing. (Trial Tr. at 128-29, 132 (Taylor); Trial Tr. at 1242 (Popplewell).) On the other hand, Vamvakas categorically denied that Taylor asked him to commit Investcorp's client capital to the

---

[2]      The defined prospect concept would essentially allow Investcorp to share in the revenue from certain prospective clients who were incentivized or likely to invest in Kortright as a result of the Man Transaction but whose relationships Investcorp had assisted in cultivating. (Trial Tr. at 130, 223-24 (Taylor); Trial Tr. at 690-91, 833 (Vamvakas).) Plaintiffs and Investcorp ultimately selected nine defined prospects, who were expected to yield over $1 billion in investments. (Trial Tr. at 223 (Taylor).)

[3]      This Opinion & Order uses the term "participation" synonymously with consenting to transfer capital, whereas the phrase "consent as a contractual matter" refers solely to Investcorp's not raising any of its rights under the Project Agreement or the fund documents to block the Man transaction. (See Trial Tr. at 244-45 (Taylor).)

contemplated Man transaction, that Taylor ever told him the transaction required Investcorp's commitment of client capital, that he indicated to Taylor that Investcorp would commit client capital to the transaction, or that he in fact committed Investcorp to leaving its client capital invested. (Trial Tr. at 678-79, 827-31 (Vamvakas).) Instead, Vamvakas testified that he essentially informed Plaintiffs that there was no guarantee of client capital in proceeding with the transaction. (Trial Tr. at 678-79; 827 (Vamvakas).)

Though the parties' accounts diverge as to the extent to which Vamvakas represented that Investcorp's client capital would remain invested, this Court finds Taylor's contemporaneous email memorializing the April 6 telephone call to be probative evidence as to what was discussed.[4] (See P-113.) In that email, also sent on April 6, Taylor purported to "summarize [their] conversation as best [he] could" and solicited Vamvakas' feedback. (P-113.) Among other items, Taylor's email restated the parties' agreement for the "Kortright funds to move to Man GLG" and for the "Project agreement to be terminated/amended." (P-113.) With respect to Investcorp's revenue share rights, Taylor wrote "IVC to retain existing revenue share for balance of term." (P-113.) And most relevant to what Vamvakas may have said on the April 6 telephone call with respect to Investcorp's client capital, Taylor recounted that the "[e]xpectation is that IVC prop capital to be redeemed as soon as practicable and IVC client capital to remain invested." (P-113.) On balance, this Court finds that Vamvakas at minimum represented that Investcorp intended to participate in Option A by leaving its client capital invested—implicitly, through the closing of the transaction.[5]

---

[4]    Notably, no party disputed the accuracy of Taylor's characterization at the time he circulated the email. Moreover, no party was able to testify to the exact words that Vamvakas used on the April 6 telephone call. (See, e.g., Trial Tr. at 1278-79 (Popplewell).)

[5]    Plaintiffs point to the eventual revenue sharing agreement, which governs Investcorp's entitlement to a revenue share post-closing, as evidence that Vamvakas promised to commit client capital through closing. But as this Court has previously observed, the revenue sharing arrangement only addresses Investcorp's entitlement to an

Vamvakas responded later that evening with some comments and a proposal to speak more at noon the following day, April 7, 2016. (See P-114.) On the April 7 telephone call, Taylor and Vamvakas updated each other on the status of some of the items set forth in Taylor's April 6 email, including the defined prospects list, the possibility of a revenue share for new clients, and the schedule for Investcorp to receive a revenue share post-closing. (Trial Tr. at 138-39 (Taylor); accord Trial Tr. at 1244 (Popplewell).) Vamvakas testified that he did not make any commitment with respect to client capital on the April 7 phone call, which Plaintiffs do not appear to dispute. (See Trial Tr. at 834 (Vamvakas).) Taylor sent another email on April 11 further detailing the parties' agreement to the schedule regarding the investment needed for Investcorp to maintain a revenue share, followed by emails between Taylor and Vamvakas the next day updating the defined prospect list. (P-116; P-122; P-123.)

III.     The Man Transaction

In mid-April 2016, the parties engaged Sidley Austin LLP to draft the agreements needed to consummate the Man transaction, with three separate attorneys from the firm representing Plaintiffs, Investcorp, and Man. (Trial Tr. at 137, 147 (Taylor); Trial Tr. at 688, 837 (Vamvakas); see also Trial Tr. at 463-66 (Munsell).) The parties held a kick-off call with Sidley Austin on April 12, 2016. Vamvakas testified that he did not represent that Investcorp would commit its client capital on that call. (Trial Tr. at 838 (Vamvakas).) Following the kick-off call, Taylor circulated a revised list of summary terms reflecting additional specificity as to the revenue share schedule, changes to the defined prospect list, and the removal of the bullet point relating to the expectation that Investcorp client capital remain invested. (Trial Tr. at 148-

---

economic benefit so long as it had skin in the game—the fact of its existence does not require Investcorp to leave its client capital invested through closing.  See Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd., 327 F. Supp. 3d 673, 679 n.2 (S.D.N.Y. 2018).

51, 324-25 (Taylor); Trial Tr. at 466-67 (Munsell); Trial Tr. at 689-90 (Vamvakas); see P-126.)

Taylor explained that this bullet point had essentially been folded into the concept of an aggregate minimum balance at closing. (Trial Tr. at 324-25 (Taylor).)

Based on these terms, the Sidley Austin attorneys drafted several agreements governing the relationships among Plaintiffs, Investcorp, and Man, which the parties executed on June 16, 2016.[6] (Trial Tr. at 476-77 (Munsell).) Specifically, (1) Plaintiffs and Investcorp entered into an agreement that terminated the Project Agreement and accordingly, many of Investcorp's special rights as a seed investor (P-187); and (2) Taylor, Popplewell, Investcorp, and Man entered into a revenue sharing agreement that governed Investcorp's revenue share rights in the Kortright funds post-closing as long as Investcorp maintained a minimum threshold of client capital invested (P-186; see also Trial Tr. at 695-96 (Vamvakas)). Kortright, Taylor, and Man also executed the Man transaction agreement, which required that Kortright obtain the consent of its investors as a condition precedent to closing. (P-184; Trial Tr. at 175-76 (Taylor).)

To satisfy the transaction agreement's condition precedent and in accord with § 5.2 of the transaction agreement, Plaintiffs prepared an investor consent letter informing their investors of the Man transaction, sharing that Investcorp "plans to continue its partnership" with Plaintiffs, and soliciting investor consent to the transaction via the transfer of capital. (P-190; Trial Tr. at 176-77 (Taylor).) The consent letter—dated June 17, 2016—required Kortright's investors to affirmatively consent to the Man transaction by June 24, 2016 or be compulsorily redeemed from the Kortright fund on June 30, 2016. (Trial Tr. at 180 (Taylor); Trial Tr. at 527 (Munsell); Trial Tr. at 733 (Vamvakas).) With respect to its client capital, Investcorp returned ballots affirmatively consenting to the Man transaction on June 22 and June 23, 2016. (Trial Tr.

---

[6] The various Sidley Austin teams also drafted employment agreements between Plaintiffs and Man, as well as documents relating to the transfer and change of control of the funds. (Trial Tr. at 477 (Munsell).)

at 730-33 (Vamvakas); P-197; P-204.) While hoping to bring a $50 million fund to Man, by June 24, 2016, Plaintiffs had received consent from investors with a total of $44 million invested in Kortright, including approximately $40 million from Investcorp's clients. (See P-209; Trial Tr. at 132, 412 (Taylor).)

IV.    The Implosion of the Man Transaction

Investcorp's consent to the Man transaction with respect to its client capital can be characterized as ephemeral. The morning of Friday, June 24, 2016, Vamvakas sent Taylor an email, stating "Matt, we have a serious problem. We need to speak ASAP." (P-210.) Vamvakas and Taylor spoke sometime that day. During their conversation, Vamvakas informed Taylor that Investcorp realized it needed to obtain its own clients' consent to the Man transaction, which it did not have and would be unable to obtain. (Trial Tr. at 187-88 (Taylor); accord Trial Tr. at 849 (Vamvakas).) Taylor—who was upset, to say the least—responded that Investcorp needed to fix the problem, either by substituting its own proprietary capital or by obtaining its clients' consent. (Trial Tr. at 188 (Taylor); Trial Tr. at 850 (Vamvakas); cf. P-212.) In response to Taylor's repeated inquiries, Vamvakas updated him by email throughout the day on the status of purported efforts to obtain consent from Investcorp's clients. (Trial Tr. at 189-90 (Taylor); P-212; P-219.) Vamvakas also updated Erdely on the status of his communications with Taylor. (Trial Tr. at 986 (Erdely).) Friday came and went without any change in Investcorp's client consent—by late Friday afternoon, Taylor suggested that Vamvakas "give some thought to quantifying damages" if he could not resolve the problem. (P-219.)

Over the weekend, Taylor continued to press Vamvakas about his efforts to resolve the client consent issue. (Trial Tr. at 190 (Taylor).) At the same time, Taylor kept Popplewell and Man apprised of the unfolding situation. (Trial Tr. at 190-91 (Taylor); see also

P-227.)  That following Monday—June 27, 2016—Vamvakas emailed Taylor to let him know

that Investcorp would not "be in a position to consent to the Man Transaction" and "[a]s a result,

Investcorp's clients will be mandatorily redeemed from the Fund as of June 30, 2016."  (P-219.)

Thereafter, Taylor informed Man that Investcorp would not be consenting to the Man

transaction.  (Trial Tr. at 1129-30, 1139, 1146-47 (Jones).)

        In the ensuing days leading up to June 30, 2016—the contemplated closing date—

Plaintiffs and Man searched for a way to salvage the Man transaction without Investcorp's

participation.[7]  (Trial Tr. at 194, 196 (Taylor); see P-222; P-223; P-225.)  At Taylor's request,

Vamvakas spoke with Mark Jones of Man on June 29, 2016.  (Trial Tr. at 771-72, 853-54

(Vamvakas); Trial Tr. at 1148-49 (Jones); P-230.)  In substance, Vamvakas relayed the same

reason for withdrawing Investcorp's consent with respect to its client capital—that is, that

Investcorp's underlying clients did not consent to the Man transaction and the transfer of their

capital because they no longer wanted the risk of the Kortright strategy.  (Trial Tr. at 772-83

(Vamvakas); Trial Tr. at 1146-48 (Jones).)  Jones and Vamvakas asked each other whether

Investcorp or Man could inject other sources of capital into the fund, but neither could.  (Trial Tr.

at 772, 854 (Vamvakas).)  Ultimately, Plaintiffs and Man concluded that the Man transaction

could not be consummated without Investcorp's participation.  The final nail in the coffin came

on June 30, 2016, when Vamvakas confirmed by email that there was "no change in consent."

(P-234.)

        But the truth was that contrary to what Vamvakas told Taylor, Investcorp never

actually needed the consent of its own clients to participate in the Man transaction.  (Trial Tr. at

---

[7]      During this period, Investcorp—apparently believing that the Man transaction did not require its client
capital to close—took steps to consent as a contractual matter.  (Trial Tr. at 850-53 (Vamvakas).)  Vamvakas and
Erdely testified unequivocally that Investcorp never stood on any of its contractual rights under the Project
Agreement to block the Man transaction.  (Trial Tr. at 872-73 (Vamvakas); Trial Tr. at 1051-52 (Erdely).)

747 (Vamvakas); <u>see</u> Trial Tr. at 973-76 (Erdely) (testifying that Investcorp did not need client approval of redemptions based on its discretionary authority over investment decisions).)  As Vamvakas testified, the need for client consent was a lie he concocted to soften the blow to Plaintiffs as to why Investcorp needed to withdraw client capital, notwithstanding Erdely's admonitions to tell the truth.[8]  (<u>See</u> Trial Tr. at 747-81, 849-50 (Vamvakas); <u>see also</u> Trial Tr. at 980-82 (Erdely).)  In fact, the decision to withdraw from participation in the Man transaction stemmed at least in part from a meeting Vamvakas had on the afternoon of June 22, 2016 with two members of Investcorp's investment team—Erdely and Greg Berman, the primary Investcorp analyst covering Kortright.  After receiving Kortright's investor consent letter, Erdely instructed Berman to prepare an analysis on whether to consent or redeem for that meeting.[9]  (Trial Tr. at 955-57, 1040-41 (Erdely); <u>see</u> P-198; P-199; P-200.)  At the meeting, Berman expressed his concerns to Vamvakas and Erdely about Plaintiffs' ability to manage money and Kortright's deteriorating performance.  (Trial Tr. at 735-44, 847-48 (Vamvakas); Trial Tr. at 1045-46 (Erdely).)  By the end of the meeting, Erdely had decided to redeem Investcorp's client capital on Berman's recommendation,[10] although he did not inform Vamvakas of his final decision until the next day.  (Trial Tr. at 848 (Vamvakas); Trial Tr. at 970-71, 1046 (Erdely); <u>see</u>

---

[8]     While Vamvakas's lie and subsequent efforts to cover it up are arguably suggestive of some knowledge of wrongdoing, this Court does not find them to bear on Kortright's negligent misrepresentation claim.  <u>See Kortright Capital Partners</u>, 330 F.R.D. at 139 ("The crux of that claim is <u>whether</u> Investcorp misrepresented its willingness to leave its client capital invested, which is separate from the reason or reasons <u>why</u> it did not do so downstream." (emphasis in original)).

[9]     The analysis of Kortright's performance, which was conducted by another Investcorp analyst the morning of June 22, contains significant mathematical errors as well as typographical errors reflecting Investcorp's analysis of another hedge fund from which Investcorp had redeemed its capital.  (<u>See</u> Trial Tr. at 956-64, 966-67, 1087-88 (Erdely).)  However, the propriety of Investcorp basing a major investment decision on a hastily conducted, error-laden analysis is not before this Court.

[10]    At trial, Erdely's testimony as to the basis for his decision was somewhat equivocal.  To the extent that Erdely claimed that Berman's analysis had nothing to do with his decision, this Court finds that testimony not entirely credible and inconsistent with Erdely's concession that the analysis was prepared for the purposes of making his redemption decision.  (<u>See</u> Trial Tr. at 966, 969 (Erdely).)

P-201 (email from Berman after the June 22 meeting reflecting the recommendation to redeem "Kortright now").)

Despite Vamvakas' initial surprise at the June 22 meeting about the sudden prospect of redeeming Investcorp's client capital, the writing was on the wall from the investment team's perspective. While Investcorp had an investment committee—chaired by Erdely—that made final investment decisions with respect to single managers, approval by the investment committee had not been—and never would be—sought with respect to the transfer of client capital.[11] (Trial Tr. at 884, 1000-01 (Erdely), see Trial Tr. at 738 (Vamvakas).) Along similar lines, Erdely never spoke with Vamvakas, Taylor, or Popplewell about the transfer of client capital to Man, despite his roles as the chair of the investment committee and as chief investment officer. (Trial Tr. at 939-40 (Erdely).) And one day before the June 22 meeting, members of Investcorp's investment team contemplated a potential redemption of its client capital, either in June 2016 or September 2016. (P-196.)

V.     The Aftermath

Several consequences radiated from the Man transaction's failure to close. Plaintiffs liquidated the Kortright portfolio to satisfy the redemption of Investcorp's client capital, which constituted approximately 90% of the fund. (Trial Tr. at 196-98 (Taylor).) Plaintiffs and Investcorp entered into an amended agreement terminating the Project Agreement to provide Plaintiffs additional time to satisfy the redemption in an orderly manner. (Trial Tr. at

---

[11]     Investcorp's failure to seek investment committee approval is difficult to reconcile with its apparent contemporaneous return of investor ballots consenting to the Man transaction. Nonetheless, Erdely testified that he had the final say on investment decisions, that he could make those decisions without a formal investment committee meeting in exigent circumstances, and that he had done so on other occasions. (Trial Tr. at 1003-04 (Erdely); see Trial Tr. at 972-73 (Erdely) (explaining that the redemption decision was made without the blessing of the full investment committee in the interest of expediency).) For instance, while the investment committee should have approved the terms memorialized in the revenue sharing agreement, it appears that Erdely approved the terms based on a discussion with Vamvakas. (See Trial Tr. at 950-51 (Erdely).)

197-201 (Taylor); Trial Tr. at 492-94 (Munsell); Trial Tr. at 768, 855-56 (Vamvakas); see P-233.)  The cratering of the Man transaction also impacted Taylor and Popplewell personally.  Since the failure of the Man transaction to close, Taylor has not been employed in the investment management business despite his efforts to obtain employment.  (Trial Tr. at 236-39 (Taylor).)  Likewise, Popplewell has been unable to find employment in the investment management industry.  (Trial Tr. at 1252-54 (Popplewell).)

## DISCUSSION

I.    Jurisdiction

This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and because this action is between citizens of a state and citizens of a foreign state.  (See Trial Tr. at 39 (Taylor); Trial Tr. at 803 (Vamvakas); Trial Tr. at 1222 (Popplewell).)

II.   Expert Testimony

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert and other scientific or technical testimony, and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In determining whether expert testimony is admissible, a court acts as a gatekeeper to determine whether "the expert's testimony both rests on a reliable foundation and

is relevant to the task at hand." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597

(1993); accord Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 184 (2d Cir. 2001). The

Daubert standard applies not only to scientific testimony, but other types of expert testimony,

including testimony from economists. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147

(1999). The proponent of expert testimony must establish admissibility by a preponderance of

the evidence. Bourjaily v. United States, 483 U.S. 171, 175-76 (1987). Nonetheless, Rule 702

"embodies a liberal standard of admissibility for expert opinions." Nimely v. City of N.Y., 414

F.3d 381, 395 (2d Cir. 2005).

   Each side moved before trial to preclude testimony by the other side's damages

and industry experts. At trial, this Court opted to receive testimony from the experts "subject to

a later determination as to whether the evidence should be credited or disregarded under Daubert

and its progeny." (Trial Tr. at 640.) This course of action flows from the precept that "Daubert

and its progeny . . . do not apply straightforwardly in the context of bench trials," 720 Lex

Acquisition LLC v. Guess? Retail, Inc., 2014 WL 4184691, at *10 (S.D.N.Y. Aug. 22, 2014)

(internal citations omitted), in which "there is no possibility of prejudice[] and no need to protect

the factfinder from being overawed by 'expert' analysis," Chill v. Calamos Advisors LLC, 2018

WL 4778912, at *6 (S.D.N.Y. Oct. 3, 2018) (citation omitted); see also Joseph S. v. Hogan, 2011

WL 2848330, at *2 (E.D.N.Y. July 15, 2011) (characterizing a Daubert motion in a bench trial as

"essentially asking [the Court] to gate-keep expert testimony from [itself]"). Thus, "unless the

disputed evidence is wholly irrelevant or so speculative as to have no probative value," a court

may freely receive the evidence and disregard it later if it fails to satisfy the strictures of Rule

702 and Daubert. 720 Lex Acquisition LLC, 2014 WL 4184691, at *10; accord Chill, 2018 WL

4778912, at *6-7. With these principles in mind, this Court addresses the parties' respective

experts.

A. Damages Experts

Investcorp moved to preclude the testimony of Dr. Paul Gompers, Plaintiffs'
damages expert, on the basis that his damages methodology is barred by New York law. In
particular, Dr. Gompers purported to calculate damages using a discounted cash flow model that
estimated the value of the economic benefits that the Man transaction would have generated for
Plaintiffs over ten years as of June 30, 2016. (See Declaration of Christopher M. Joralemon in
Support of Investcorp's Daubert Motions and Motions in Limine, ECF No. 147 ("Joralemon
Decl."), Ex. A ("Gompers Report"), ¶¶ 24, 27; Trial Tr. at 554-55, 558-59, 587 (Gompers).)
Separately, Plaintiffs moved to preclude the testimony of Dr. Glenn Hubbard, Investcorp's
rebuttal damages expert. This Court disregards Dr. Gompers' testimony because his analysis and
conclusions do not provide the proper measure of damages for Plaintiffs' negligent
misrepresentation claim as a matter of law, and consequently, the rebuttal testimony of Dr.
Hubbard will also be disregarded.[12]

For negligent misrepresentation claims, the New York Court of Appeals has
reiterated that "[d]amages are to be calculated to compensate plaintiffs for what they lost because
of the fraud, not to compensate them for what they might have gained" or "profits which would
have been realized in the absence of fraud." Lama Holding Co. v. Smith Barney Inc., 668
N.E.2d 1370, 1374 (N.Y. 1996); see also Cayuga Harvester, Inc. v. Allis-Chalmers Corp., 465
N.Y.S.2d 606, 618 (N.Y. App. Div. 1983) (stating that damages for fraud-based claims "are to

---

[12]     Apart from his critiques of Dr. Gompers' testimony, Dr. Hubbard attempted to approximate damages in the
absence of fraud by offering counterfactuals grounded in the assumption that Vamvakas had "cured" any
misrepresentation by explicitly disclaiming any commitment with respect to client capital and that any investment
would have needed to be approved by the investment committee. (Trial Tr. at 1467-69 (Hubbard).) This Court need
not credit Dr. Hubbard's but-for worlds, however, because Plaintiffs may only recover the amount necessary to
restore them to the position they occupied before Investcorp's April 2016 representations.

give the plaintiff what he lost because he made the bargain, not what he could have gained had it been performed"). This so-called "out-of-pocket" rule limits damages for fraud-based claims to "the actual pecuniary loss sustained as the direct result of the wrong." Norcast S.ar.l. v. Castle Harlan, Inc., 48 N.Y.S.3d 95, 97 (N.Y. App. Div. 2017) (citation omitted); cf. Kumiva Grp., LLC v. Garda USA Inc., 45 N.Y.S.3d 410, 413 (N.Y. App. Div. 2017) ("[A] plaintiff alleging fraudulent inducement is limited to 'out of pocket' damages, which consist solely of the actual pecuniary loss directly caused by the fraudulent inducement.").

Here, Plaintiffs asserted damages based on the demise of Kortright's business, the loss of benefits from the Man transaction that would have accrued to Taylor and Popplewell, and reputational harm. (Compl. ¶¶ 23, 91-94, 103; Proposed Joint Pretrial Order, ECF No. 93, at 4.) As an initial matter, the out-of-pocket rule precludes Plaintiffs from recovering the lost profits that they would have received from the Man transaction. Lama Holding Co., 668 N.E.2d at 1374; Cayuga Harvester, Inc., 465 N.Y.S.2d at 618. Similarly, Taylor and Popplewell cannot recover for the asserted harm to their business reputations. Indeed, in applying the out-of-pocket rule, "courts have barred recovery for lost profits, loss of customers, and injury to business reputation" for fraud and negligent misrepresentation claims. In re Optimal U.S. Litig., 837 F. Supp. 2d 244, 266 (S.D.N.Y. 2011); see also Serino v. Lipper, 994 N.Y.S.2d 64, 70 n.6 (N.Y. App. Div. 2014) (explaining that the "out-of-pocket damages rule would also prohibit the recoupment of lost earning ability for fraud and negligent misrepresentation"). In any event, Dr. Gompers' testimony and conclusions are unhelpful because he did not conduct any analysis as to reputational harm. (Trial Tr. 578-79.)

Rather, the proper measure of damages (assuming that Plaintiffs have proven liability) is based on the destruction of the value of the Investcorp-seeded Kortright business as

of early April 2016—that is, the position that Plaintiffs occupied before Investcorp's purportedly negligent conduct. See Nielsen Co. (U.S.), LLC v. Success Sys., Inc., 112 F. Supp. 3d 83, 109 (S.D.N.Y. 2015); accord Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc., 453 N.Y.S.2d 750, 755 (N.Y. App. Div. 1982) (explaining that under the out-of-pocket rule, "the defrauded party is entitled solely to recovery of the sum necessary for restoration to the position occupied before the commission of the fraud" (citation omitted)). But even if Dr. Gompers forecasted the Man transaction's value with Nostradamic accuracy, the flaw in his approach is that this estimate of what Plaintiffs expected to earn from the Man transaction while tethered to Man says little about the value of the existing Kortright business as of April 2016—when Kortright was seeded by Investcorp and had at most an indicative proposal from Man.

To salvage Dr. Gompers' testimony, Plaintiffs counter that the future economic benefits of the Man transaction may be used to measure the value of the Kortright business in April 2016—namely, on the theory that it constitutes a lost income-producing asset, that it constitutes a lost business opportunity, or that it approximates what an entity would have paid to acquire Kortright in an arm's-length transaction. None of these arguments is persuasive. As to the first theory, Plaintiffs rely principally on Schonfeld v. Hilliard, 218 F.3d 164 (2d Cir. 2000). In Schonfeld, the plaintiff asserted various contract and tort claims, alleging in substance that defendants induced him to abandon a certain March Supply Agreement and enter into an Interim Agreement and December Supply Agreement by falsely representing their intention to fund the Interim Agreement. Schonfeld, 218 F.3d at 171-72. According to plaintiff, defendants' breach of their agreement to provide funding led to the loss of the December Supply Agreement. Schonfeld, 218 F.3d at 172. As relevant here, the Second Circuit concluded that plaintiff could recover damages based on the loss of the March and December Supply Agreements as lost

income-producing assets.  See Schonfeld, 218 F.3d at 175.

But even assuming that the Man transaction agreement constitutes an income-producing asset with a determinable market value, this Court disagrees that it is an existing asset that Plaintiffs abandoned in reliance on Investcorp's representations.[13]  Rather, it is precisely what Plaintiffs sought to obtain in reliance on those representations.  That the Schonfeld panel allowed plaintiff to recover the value of the December Supply Agreement—that is, the agreement that the Schonfeld plaintiff was induced to enter—is of no moment.  Critically, the Second Circuit noted that the plaintiff there sought to recover the market value of the December Supply Agreement "in connection with his breach of contract, promissory estoppel, breach of fiduciary duty and corporate waste and mismanagement claims."  Schonfeld, 218 F.3d at 177 n.2.  For his analogous fraud claim, however, the plaintiff sought only to recover the market value of the March Supply Agreement—in other words, the existing agreement that he abandoned in reliance on the defendants' representations.  Schonfeld, 218 F.3d at 177 n.2; see Schonfeld, 218 F.3d at 183 (explaining that because the out-of-pocket rule "permits recovery for a plaintiff's reliance interest, including damages incurred by passing up other business opportunities," plaintiff "may seek to recover the market value of the March Supply Agreement . . . abandoned in reliance on [defendants'] promises" (citations and quotation marks omitted)).  Accordingly, Schonfeld does not compel a contrary result.

Second, this Court remains unconvinced that the Man transaction constitutes a compensable lost business opportunity for purposes of Plaintiffs' negligent misrepresentation claim.  While Kortright points to a bankruptcy court decision that calculated damages based on

---

[13]      Plaintiffs' assertion that the Man transaction is an existing asset based on the existence of executed agreements is unavailing.  As noted above, these agreements were not executed until after Investcorp's April 2016 representations.

the value of the combined entity that <u>would have</u> resulted from a merger, the cases that the bankruptcy court relied on for that proposition arise in the tortious interference context. <u>See</u> <u>In re Coin Phones, Inc.</u>, 203 B.R. 184, 215 (Bankr. S.D.N.Y. 1996). That distinction makes all the difference—in the tortious interference context, that measure of damages is logical because a plaintiff is entitled to "the full pecuniary loss of the benefits of the contracts with which [defendant] interfered." <u>Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.</u>, 406 N.E.2d 445, 452 (N.Y. 1980). In the negligent misrepresentation context, by contrast, the out-of-pocket rule limits a plaintiff "solely to the recovery of the sum necessary for restoration to the position occupied before the commission of the fraud." <u>Clearview Concrete Prods.</u>, 453 N.Y.S.2d at 755. Third, this Court rejects Plaintiffs' argument that the economic benefits of the Man transaction that would have accrued to Plaintiffs are a sufficient proxy for what a third party would have paid to acquire Kortright as of April 2016. <u>Cf.</u> <u>Schonfeld</u>, 218 F.3d at 178 (explaining, at least in the breach of contract context, that "a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value").

Finally, using Dr. Gompers' testimony to measure damages based on the value of Option B is also problematic, even setting aside the fact that Plaintiffs do not appear to have premised their negligent misrepresentation damages on Option B in the complaint or proposed joint pretrial order. <u>Cf.</u> Fed. R. Civ. P. 26(a)(1)(A)(iii) (requiring parties to disclose a "computation of each category of damages claimed by the disclosing party"); <u>Design Strategy, Inc. v. Davis</u>, 469 F.3d 284, 296-97 (2d Cir. 2006) (upholding district court's determination that sanctions were appropriate based on plaintiff's failure to disclose lost profits damages theory until proposed pretrial order); <u>24/7 Records, Inc. v. Sony Music Entmt., Inc.</u>, 566 F. Supp. 2d 305, 317-18 (S.D.N.Y. 2008) (precluding lost income-producing asset damages theory disclosed

for the first time in joint pretrial order). To be sure, Taylor and Popplewell testified that they perceived Option B to be substantially similar economically to Option A. (See Trial Tr. at 115 (Taylor) (testifying that Options A and B were "roughly equivalent" and "basically equivalent" from a "purely financial or economic perspective"); Trial Tr. at 1235-36 (Popplewell) (testifying that Option A was "slightly better" economically, but "not by a significant margin").) Apart from Taylor and Popplewell's lay testimony equating Options A and B economically, however, Plaintiffs offer no calculation or estimation of the value of Option B as of April 2016.

More fundamentally, while Plaintiffs point to district court decisions from this circuit considering foregone alternative business opportunities to be out-of-pocket losses, these holdings are difficult to reconcile with New York appellate decisions reaffirming that "the loss of an alternative contractual bargain . . . cannot serve as a basis for fraud or misrepresentation damages," at least to the extent that the existence or loss of the bargain is "undeterminable and speculative." E.g., Starr Found. v. Am. Int'l Grp., Inc., 901 N.Y.S.2d 246, 249 (N.Y. App. Div. 2010) (citation omitted); Alpert v. Shea Gould Climenko & Casey, 559 N.Y.S.2d 312, 315 (N.Y. App. Div. 1990); accord Pasternak v. Dow Kim, 961 F. Supp. 2d 593, 597 & n.4 (S.D.N.Y. 2013) (citing Stewart v. Jackson & Nash, 976 F.2d 86 (2d Cir. 1992) and Lam v. Am. Express Co., 265 F. Supp. 2d 225 (S.D.N.Y. 2003) as examples of federal cases "that seem to take a broader view of New York law"). For these reasons, this Court finds Dr. Gompers' testimony unhelpful in assessing any potential damages based on the value of Option B.

At bottom, Dr. Gompers' analysis would not assist in understanding the evidence or determining a fact in issue. In other words, his methodology reflects "the sort of 'apples and oranges' comparison" that should be rejected as irrelevant on the issue of damages. Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d 346, 354 (S.D.N.Y. 2003); see Daubert, 509 U.S. at 591

("Expert testimony which does not relate to any issue in the case is not relevant and ergo, non-helpful." (citation and quotation marks omitted)).  Accordingly, this Court does not consider it.

B.  Industry Experts

Prior to trial, both sides also moved to preclude the testimony of their opposing industry experts—Henry Klein for Plaintiffs, and Fabio Savoldelli for Investcorp.  Plaintiffs offered testimony from Klein on seed investor customs and practices in the hedge fund industry and the investment performance of Kortright leading up to and after June 2016.  In particular, Klein opined that Kortright's performance between February 2016 and May 2016 was not abnormal, that Investcorp's redemption of capital adversely impacted Kortright's performance in June 2016, and that Investcorp's non-consent to the Man transaction sent a negative signal to Man and Kortright's investors.  Savoldelli testified to the fiduciary duties owed by asset managers to their clients and the usage of mandatory redemption clauses and special redemption windows.  Savoldelli also responded to a few aspects of Klein's testimony, opining that Kortright's performance between April and June 2016 was highly anomalous, that any liquidation in June 2016 did not meaningfully affect Kortright's June 2016 performance, and that any negative signal to Man or Kortright's competitors sent by Investcorp's redemption of client capital was overshadowed by Kortright's own track record leading up to June 2016.

In contrast to the wholesale exclusion of the irrelevant testimony of Dr. Gompers (and by extension, Dr. Hubbard), Klein and Savoldelli's testimony calls for a more nuanced approach.  In particular, this Court finds that Klein's general testimony relating to seeding customs and practices in the hedge fund industry to be potentially helpful in understanding the nature of the Kortright-Investcorp relationship and their respective roles.  Cf. SLSJ, LLC v. Kleban, 277 F. Supp. 3d 258, 268 (D. Conn. 2018) (explaining that in the Second Circuit, courts

"generally permit corporate governance testimony, but experts are restricted to explaining general corporate governance concepts, such as setting forth the respective roles of a corporation's officers and directors, the nature of an officer's fiduciary duties to the corporation, or the concept of parent-subsidiary corporate separateness" (citation and quotation marks omitted)).  On the other hand, Klein's interpretation of the Project Agreement and the seeding relationship it creates need not be considered because a court is well-equipped to interpret contractual provisions.  Red Rock Commodities, Ltd. v. Standard Chartered Bank, 140 F.3d 420, 424 (2d Cir. 1998).

Likewise, this Court will consider Savoldelli's testimony as to the general nature of an investment manager's fiduciary duty to its investor clients, as well as his explanation of transactional concepts and their usage, such as mandatory redemption clauses and special redemption windows.  Cf. United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) (approving the use of expert testimony to "help a jury understand unfamiliar terms and concepts, . . . [p]articularly in complex cases involving the securities industry").  However, as with Klein's testimony, this Court will not consider Savoldelli's own interpretation of specific provisions of the Man transaction agreement or Kortright's investor consent letter.  See Red Rock Commodities, Ltd., 140 F.3d at 424.

Finally, the experts offer dueling opinions on whether Kortright's performance between April and June 2016 was anomalous, the effect of Investcorp's redemption of capital on Kortright's June 2016 performance, and the signal Investcorp's redemption of capital may have sent to Man and other Kortright investors.  This Court expresses doubt as to the relevance of these topics to the analysis of Plaintiffs' negligent misrepresentation claim.  Nonetheless, it need not categorically disregard Klein and Savoldelli's testimony on these issues.  See Taylor

Precision Prods., Inc. v. Larimer Grp., Inc., 2018 WL 4278286, at *32 (S.D.N.Y. Mar. 26, 2018) (stating that "exclusion of expert testimony is warranted only when the district court finds 'serious flaws in reasoning or methodology'" (citation omitted)); see also Van Alen v. Dominick & Dominick, Inc., 560 F.2d 547, 552 (2d Cir. 1977) (noting that "ordinarily it may be the more prudent course in a bench trial to admit into evidence doubtfully admissible records, and testimony based on them"). In other words, such evidence "should be quite freely admitted so that the judge may 'have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions.'" Royal & Sun Alliance Ins. PLC v. UPS Supply Chain Sols., Inc., 2011 WL 3874878, at *2 (S.D.N.Y. August 31, 2011) (citation omitted); accord Daubert, 509 U.S. at 596 (regarding "[v]igorous cross-examination" and "presentation of contrary evidence" as among the "traditional and appropriate means of attacking shaky but admissible evidence").

III.     Negligent Misrepresentation

A claim for negligent misrepresentation requires the following elements to be established: (1) that the defendant had a duty, as the result of a special relationship, to give correct information; (2) that the defendant made a false representation that he should have known was incorrect; (3) that the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) that the plaintiff intended to rely and act upon it; and (5) that the plaintiff reasonably relied upon it to his or her detriment. Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 114 (2d Cir. 2012); accord Mandarin Trading Ltd. v. Wildenstein, 944 N.E.2d 1104, 1109 (N.Y. 2011).

For the reasons that follow, this Court concludes that Plaintiffs have not proven by a preponderance of the evidence that Investcorp made a false representation that it should

have known was incorrect or that Plaintiffs' reliance on Investcorp's April 2016 statements was reasonable. Because Plaintiffs have not carried their burden to establish liability, judgment shall be entered in favor of Investcorp.

A. Actionable Misrepresentation

Generally, an actionable misrepresentation "must be factual in nature and not promissory or relating to future events that might never come to fruition." Hydro Inv'rs, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20-21 (2d Cir. 2000); accord Murray v. Xerox Corp., 811 F.2d 118, 123-24 (2d Cir. 1987) ("Promises of future conduct are not actionable as negligent misrepresentations."). However, a promise of future action "made with a preconceived and undisclosed intention of not performing it" is a misrepresentation of material existing fact. Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc., 502 N.E.2d 1003, 1004 (N.Y. 1986) (quoting Sabo v. Delman, 143 N.E.2d 906, 908 (N.Y. 1957)); see also Murray, 811 F.2d at 121 ("Under New York law, a failure to perform promises of future acts is not fraud unless there exists an intent not to comply with the promise at the time it is made.").[14] In other words, what is falsely represented is the defendant's state of mind at the time the promise is made. See Margrove Inc. v. Lincoln First Bank of Rochester, 388 N.Y.S.2d 958, 959 (N.Y. App. Div. 1976); accord Green v. Beer, 2009 WL 911015, at *7-8 (S.D.N.Y. Mar. 31, 2009).

By way of background, this Court cabined Plaintiffs' negligent misrepresentation claim to Plaintiffs' allegations that in April 2016, Investcorp affirmatively expressed its willingness to proceed with the Man Transaction by leaving its client capital invested in Kortright, while redeeming its proprietary capital. See Kortright Capital Partners, 257 F. Supp.

---

[14] As judges in this district have observed, "[n]egligent misrepresentation involves most of the same elements as fraud, with a negligence standard substituted for the scienter requirement." Meisel v. Grunberg, 651 F. Supp. 2d 98, 123 (S.D.N.Y. 2009) (quoting Welch v. TD Ameritrade Holding Corp., 2009 WL 2356131, at *44 (S.D.N.Y. July 27, 2009)).

3d at 359, 361.  Construing Plaintiffs' allegations in the most favorable light, this Court held that these statements "reflected Investcorp's then-present intention to participate in the transfer of the Kortright funds to [Man]—an intention on which both parties acted—not simply promises of future action."[15]  Kortright Capital Partners, 257 F. Supp. 3d at 357.

Certainly, Investcorp's representations that it intended to participate in the Man transaction by leaving its client capital—as opposed to proprietary capital—invested relate to future conduct.  See, e.g., US W. Fin. Servs., Inc. v. Tollman, 786 F. Supp. 333, 344 (S.D.N.Y. 1992).  Thus, the dispositive question here is whether Investcorp harbored a preconceived and undisclosed intention not to leave its client capital invested in Kortright as of April 2016, when Vamvakas relayed Investcorp's preference for Option A and willingness to participate using client capital.[16]  On this question, Plaintiffs have not put forth sufficient evidence to prove that the answer is yes.

Specifically, Investcorp—in accord with the parties' understanding in April 2016—made a redemption request for its remaining proprietary capital in mid-May 2016 to be redeemed at the end of June but left its client capital invested.  (See Trial Tr. at 162 (Taylor); Trial Tr. at 859 (Vamvakas); see also Trial Tr. at 936-42, 1027 (Erdely).)  This account is corroborated by the minutes from a regular investment committee meeting that took place on April 22, 2016, which reflect a decision with respect to Kortright to "[r]edeem from the manager on behalf of IVC balance sheet (but retain in client portfolios and Emerging Alpha)."  (D-40;

---

[15]     At that time, Plaintiffs had alleged that these statements were misleading because Investcorp failed to disclose the need for its own clients to consent to the Man transaction.  Kortright Capital Partners, 257 F. Supp. 3d at 355, 357.

[16]     Plaintiffs also assert that Vamvakas' April 2016 representations are actionable because he did not disclose that approval by Investcorp's investment committee was required for its participation.  If Vamvakas had been upfront about the need for such approval, Plaintiffs argue they would have opted for Option B.  However, the omission of such information does not make Vamvakas' representations as to Investcorp's intent or willingness to proceed with the Man transaction—as opposed to its ability, for example—false or incorrect.

Trial Tr. at 1024-26 (Erdely).)  Moreover, the Sidley Austin attorney representing Kortright

testified that he had no recollection of any indication from Investcorp's deal counsel that the

redemption of Investcorp's client capital was a possibility.  (Trial Tr. at 474-75, 478 (Munsell).)

Taken together, this evidence suggests that as of April 2016, Investcorp intended to participate in

the Man transaction using its client capital, particularly when juxtaposed with the absence of

evidence to the contrary.  (See, e.g., Trial Tr. at 719 (Vamvakas) (testifying that he was unaware

of any hesitation or concern within Investcorp about transferring client capital even as of June

16, 2016).)

        Such a conclusion is also supported by evidence of Investcorp's conduct generally

between April 2016 and June 2016.  Following the early April 2016 discussions at issue in this

case, both Kortright and Investcorp behaved consistently with an intention to proceed with the

Man transaction by taking action in furtherance of the transaction.  For example, between April

and June 2016, Investcorp assisted in marketing the Kortright funds to its clients in connection

with the Man transaction.  (Trial Tr. at 149, 153, 157 (Taylor); Trial Tr. at 907-16 (Erdely).)

Indeed, Taylor testified that Investcorp's negligent misrepresentation "begins with the

representations made in early April, and extends all the way through all of their conduct that

confirmed those very same April representations, all the way until the very end of June, when all

of a sudden it was different."  (Trial Tr. at 340 (Taylor).)  In other words, Taylor's testimony that

Investcorp acted consistently with its April 2016 representations until June 2016 undermines the

suggestion that Investcorp never intended to leave its client capital invested.  Accord Elliot v.

Nelson, 301 F. Supp. 2d 284, 288 (S.D.N.Y. 2004) (finding that evidence demonstrating that

defendants had taken steps—albeit unfruitful ones—toward raising money for a venture capital

fund undermined the falsity of purported representations that defendants intended to raise the

money).

To be sure, Investcorp had concerns with Kortright's performance in April 2016. (See Trial Tr. at 698 (Vamvakas); Trial Tr. at 896-97 (Erdely).)  These concerns began in July or August of 2015—indeed, Erdely had met with Plaintiffs on at least one occasion to discuss redemptions of capital based on performance-related concerns.  (Trial Tr. at 820-21 (Vamvakas); see also Trial Tr. at 892-93, 1011-12 (Erdely).)  However, from Investcorp's perspective, Kortright's performance deteriorated well into 2016.  Compared to its peers, for example, Kortright's performance gradually degraded in Investcorp's eyes from ranking in the top quartile in December 2015 to the bottom quartile by April 2016.  (Trial Tr. at 899-904 (Erdely).)  And as a quantitative matter, the Kortright funds sustained steady losses between January and May 2016, with much of the loss occurring by April 2016.  (Trial Tr. at 904-06 (Erdely).)  Moreover, in February 2016, Investcorp considered downgrading Kortright in its internal ranking system that tracked the capacity of managers to deliver future performance.  (Trial Tr. at 885-89, 893-95 (Erdely); P-78.)  Although Investcorp ultimately did not downgrade Kortright, its concern over Kortright's ability to deliver future performance grew, resulting in a downgrade from a "B" during the January to April 2016 timeframe to a "C" in May 2016.  (Trial Tr. at 885-89, 1023, 1032-33 (Erdely); P-162.)

Concluding that Investcorp held a preconceived and undisclosed intention in April 2016 not to leave its client capital invested based on its internal doubts regarding Kortright's future performance is a leap too far, especially viewed in the context of Investcorp's conduct in furtherance of the Man transaction in April 2016 and the ensuing months.  In particular, the evidence that Investcorp only considered downgrading Kortright in February 2016 and did not do so until May 2016 is insufficient to demonstrate that Investcorp intended in April 2016 to

redeem its client capital. Rather, the weight of the evidence reflects that despite Investcorp's

concerns with Kortright's deteriorating performance, it simply did not intend to redeem its client

capital until June 2016, when it believed continued investment to be untenable. (Accord Trial

Tr. at 943, 970-72, 1043-44 (Erdely).) In other words, this Court finds it implausible that

Investcorp "had lured [Plaintiffs] into the elaborate and expensive ruse of pretending" to proceed

with a transaction in which it had no intent to participate, "for no apparent purpose." Elliot, 301

F. Supp. 2d at 287. Accordingly, Plaintiffs' negligent misrepresentation claim must be

dismissed. Cf. Transit Mgmt., LLC v. Watson Indus., Inc., 803 N.Y.S.2d 860, 863 (N.Y. App.

Div. 2005) (restating the "well settled" proposition that "an alleged misrepresentation related to

promised future conduct is not actionable where there is no indication that the party that

allegedly made the misrepresentation 'did not intend to honor its commitment at the time [the

alleged misrepresentation] was made'" (alteration in original) (citation omitted)).

### B. Reasonable Reliance

Alternatively, this Court concludes that Plaintiffs fail to demonstrate that their

reliance on Investcorp's April 2016 statements as a promise that it would leave client capital

invested through closing was reasonable. The reasonableness of a plaintiff's reliance involves a

consideration of "the entire context of the transaction, including factors such as its complexity

and magnitude, the sophistication of the parties, and the content of any agreements between

them." Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir.

2003).

Here, the sophistication of Taylor and Popplewell and the parties' joint

understanding of how client capital would be invested under the very Project Agreement that sets

forth the business relationship between Kortright and Investcorp weigh against the

reasonableness of Plaintiffs' reliance.[17]  Taylor and Popplewell understood that Investcorp owed

fiduciary obligations to its clients and that Investcorp's investment of client capital was subject

to those fiduciary obligations.  (Trial Tr. at 248-49, 316-17 (Taylor); Trial Tr. at 1266-68

(Popplewell).)  Specifically, Taylor knew from his negotiation of the Project Agreement that the

investment of client capital was subject to a "fiduciary reasonable best efforts" standard.  (Trial

Tr. at 249-52, 316 (Taylor).)  Moreover, at the time Vamvakas made the April 2016

representations, he was unaware of the terms or closing date of the contemplated transaction that

would eventually become the Man transaction because those specifics had not yet been finalized.

(See Trial Tr. at 311-14 (Taylor); Trial Tr. at 830 (Vamvakas); Trial Tr. at 1281-82 (Popplewell);

accord Trial Tr. at 948, 1017-18 (Erdely).)  Given Taylor and Popplewell's experience in the

investment management industry, interpreting Vamvakas' April 2016 statements as a guarantee

that it would indefinitely invest in an undefined transaction was unreasonable.  (See Trial Tr. at

1359-60, 1368-70 (Savoldelli); Trial Tr. at 1204-05 (Klein).)

IV.    Attorney's Fees

The final issue that remains to be decided is the amount of attorney's fees to

which Plaintiffs are entitled for Investcorp's discovery misconduct.  See Kortright Capital

Partners, 330 F.R.D. at 140.  The basis for the award of attorney's fees is set forth in this Court's

January 18, 2019 Memorandum & Order, familiarity with which is presumed.  Nonetheless, a

brief overview of the relevant facts is warranted.

A.  Facts and Procedural History

The parties' discovery dispute arose from Investcorp's untimely production of

---

[17]    On summary judgment, this Court rejected Investcorp's argument that the existence of a fully integrated
agreement bars reliance on any representation not contained therein.  See Kortright Capital Partners LP, 2018 WL
6329396, at *2-3.

minutes from a June 2016 Investcorp investment committee meeting (the "Minutes"), which were referenced in an email that Investcorp had produced to Plaintiffs in early 2017.  Plaintiffs twice requested that Investcorp locate the Minutes, and twice, Investcorp represented that it could not.  Kortright Capital Partners, 330 F.R.D. at 136.  One year later, Investcorp located the Minutes during witness preparation and forwarded it to its counsel, who determined that they were not responsive to any of Plaintiffs' document requests and ultimately decided not to introduce them at trial.  Kortright Capital Partners, 330 F.R.D. at 137.

Plaintiffs moved to strike certain trial testimony relating to the Minutes and for an adverse inference based on Investcorp's untimely production of the Minutes.  This Court found Investcorp to have acted negligently in failing to timely produce the Minutes, but held that an adverse inference was unwarranted based on "the marginal relevance of the Minutes, the comparative windfall an adverse inference would yield, the amorphous prejudice suffered by Kortright, and the fact that Investcorp has come forward with the evidence."  Kortright Capital Partners, 330 F.R.D. at 139.  Nonetheless, this Court concluded that "an award to Kortright of its reasonable expenses and attorney's fees caused by Investcorp's failure to timely produce the Minutes is justified."  Kortright Capital Partners, 330 F.R.D. at 140.

Plaintiffs now seek $294,545.80 in fees for 340.36 hours expended.  Pursuant to this Court's on-the-record instruction, Plaintiffs submitted contemporaneous time records in support of their fee application for in camera review.  Investcorp also provided an in camera submission setting forth the number of hours its attorneys spent in litigating the discovery dispute and the total amount of attorney's fees generated.  (See ECF Nos. 206 and 207.)

B.  Application

The determination of a reasonable fee falls within the district court's discretion.

Millea v. Metro-N. R. Co., 658 F.3d 154, 166 (2d Cir. 2011); see also Winklevoss Capital Fund, LLC v. Shrem, 360 F. Supp. 3d 251, 256 (S.D.N.Y. 2019) (explaining that "district courts are given 'broad discretion' in determining what is reasonable under the circumstances" (citation omitted)).  The Supreme Court and the Second Circuit have both "held that the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case— creates a 'presumptively reasonable fee.'"  Millea, 658 F.3d at 166.  Although a district court "may adjust the lodestar when it 'does not adequately take into account a factor that may properly be considered in determining a reasonable fee,'" it does so "only in 'rare circumstances,' because the lodestar figure [already] includes most, if not all of the relevant factors constituting a reasonable attorney's fee.'"  Millea, 658 F.3d at 166 (emphasis in Millea) (quoting Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 533 (2010)).

While "[a] detailed explanation of the lodestar calculation is unnecessary, . . . compliance with the Supreme Court's directive that fee award calculations be 'objective and reviewable[]' implies the district court should at least provide the number of hours and hourly rate it used to produce the lodestar figure."  Millea, 658 F.3d at 166-67 (citation omitted). Moreover, a court "is not obligated to undertake a line-by-line review" of the fee application, but may "instead 'exercise its discretion and use a percentage deduction as a practical means of trimming fat.'"  Marion S. Mishkin Law Office v. Lopalo, 767 F.3d 144, 150 (2d Cir. 2014) (citation omitted).  With these principles in mind, this Court proceeds to the lodestar calculation.

1.  Hourly Rates

A reasonable hourly rate is "a rate 'in line with . . . prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, expertise and reputation.'"  McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund,

450 F.3d 91, 96 (2d Cir. 2006) (ellipsis and alteration in original) (quoting <u>Blum v. Stenson</u>, 465 U.S. 886, 895 n.11 (1984)).  Under the so-called "forum rule," the relevant community is "the district in which the reviewing court sits."  <u>Restivo v. Hessemann</u>, 846 F.3d 547, 590 (2d Cir. 2017) (quoting <u>Simmons v. N.Y.C. Transit Auth.</u>, 575 F.3d 170, 174 (2d Cir. 2009)).  Factors pertinent to a reasonable hourly rate include "'the novelty and difficulty of the questions' involved in the litigation" as well as the "size of the firm."  <u>Vista Outdoor Inc. v. Reeves Family Tr.</u>, 2018 WL 3104631, at *5 (S.D.N.Y. May 24, 2018) (citations omitted).  Further, a court may "apply its 'own knowledge' of rates charged in the community in assessing the reasonableness of the rates sought."  <u>H.B. Auto. Grp., Inc. v. Kia Motors Am., Inc.</u>, 2018 WL 4017698, at *2 (S.D.N.Y. July 25, 2018) (citation omitted), <u>report and recommendation adopted sub nom.</u> <u>H.B. Auto. Grp., Inc. v. Kia Motors Am.</u>, 2018 WL 4007636 (S.D.N.Y. Aug. 22, 2018).

Although Plaintiffs do not provide a breakdown of the hourly rates (or each attorney's total number of hours worked), this Court gleans from Plaintiffs' time records hourly rates between $1025 and $1375 for two partners of Plaintiffs' counsel's firm, between $955 and $1015 for a special counsel of the firm, and between $555 and $980 for four associates employed by the firm.  These rates also reflect an across-the-board increase in hourly rates charged by Plaintiffs' counsel in 2019.  This Court approves an hourly rate of $1200 (the median between $1025 and $1375) for the two partners of Plaintiffs' counsel's firm for this case, though it acknowledges that such a rate resides at the high end of the spectrum for hourly rates approved in this district for partners of large New York City law firms.[18]  <u>See</u> <u>Themis Capital v.</u>

---

[18]     While Investcorp does not explicitly oppose the reasonableness of the hourly rates charged by Plaintiffs' counsel, it certainly makes that suggestion by citing to cases in which judges in this district have approved hourly rates in the ballpark of $600 for large law firm partners.  (ECF No. 203, at 5-6.)  Notably, it does not cite to cases in which its own counsel's law firm sought—and received—partner hourly rates exceeding $1000.  <u>See, e.g.</u>, <u>Vista Outdoor</u>, 2018 WL 3104631, at *6 (approving hourly rates for Gibson Dunn partners between $1165 and $1260); <u>MSC Mediterranean Shipping Co. Holding S.A. v. Forsyth Kownacki, LLC</u>, 2017 WL 1194372, at *3 (S.D.N.Y. Mar. 30, 2017) (approving hourly rates for Gibson Dunn partners between $874.60 and $1048.47).

Democratic Republic of Congo, 2014 WL 4379100, at *7 (S.D.N.Y. Sept. 4, 2014) (observing that "partner billing rates in excess of $1000 an hour[] are by now not uncommon in the context of complex commercial litigation"); accord Tessemae's LLC v. Atlantis Capital LLC, 2019 WL 2635956, at *4 (S.D.N.Y. June 27, 2019) (collecting cases supporting reasonableness of "hourly rates ranging from $250 to $1260 per hour[] for attorneys' work on a commercial litigation matter"). In other words, these rates "are not excessive in the New York City 'big firm' market." Vista Outdoor, 2018 WL 3104631, at *6.

However, a reduction in Plaintiffs' requested hourly rates for the non-partner level attorneys is warranted. As an initial matter, Plaintiffs fail to submit any evidence relating to these attorneys' legal experience and skill that would allow this Court to ascertain the prevailing market rates for similar services. Cf. Farbotko v. Clinton Cty. of N.Y., 433 F.3d 204, 209 (2d Cir. 2005) ("[T]he fee applicant has the burden of showing by 'satisfactory evidence—in addition to the attorney's own affidavits'—that the requested hourly rates are the prevailing market rates." (citation omitted)). In any event, the non-partner hourly rates that Plaintiffs seek exceed the upper bound of what other judges in this district have approved. Cf. Vista Outdoor, 2018 WL 3104631, at *6 (finding associate hourly rates between $569.02 and $753.42 to be "at the upper limit of rates awarded in this District"); Themis Capital, 2014 WL 4379100, at *7-8 (approving hourly rates of $742.84 for a counsel and $505.55 for associates at a large law firm). Thus, this Court uses an hourly rate of $650 for Plaintiffs' non-partner level attorneys. Applying these reduced rates to the 75.31 total hours billed by two partners, the 49.87 hours billed by the special counsel, and the 215.18 total hours billed by four associates yields an amended lodestar of $262,654.50.

2. <u>Number of Hours</u>

Under the law of this circuit, "a court looks to the amount of time spent as reflected in contemporaneous time records, and then decides how much of that time was 'reasonably expended.'" <u>Louis Vuitton Malletier S.A. v. LY USA, Inc.</u>, 676 F.3d 83, 112 (2d Cir. 2012) (citation omitted). In making this determination, a court may consider the nature and quality of the work as well as the degree of success. <u>H.B. Auto. Grp.</u>, 2018 WL 4017698, at *3 (internal citations omitted). Other relevant factors "include 'the difficulty of the questions involved; the skill required to handle the problem; the time and labor required; . . . and the amount involved.'" <u>Weiwei Gao v. Sidhu</u>, 2013 WL 2896995, at *5 (S.D.N.Y. May 7, 2013) (citation omitted), <u>report and recommendation adopted</u>, 2013 WL 2896995 (S.D.N.Y. June 13, 2013). In examining these considerations, a court looks to "its familiarity with the case and its experience with the case as well as to the evidentiary submissions and arguments of the parties." <u>Clarke v. Frank</u>, 960 F.2d 1146, 1153 (2d Cir. 1992).

On balance, these considerations militate in favor of a percentage reduction of the amended lodestar. <u>See</u> <u>Luciano v. Olsten Corp.</u>, 109 F.3d 111, 117 (2d Cir. 1997) (authorizing district courts to address "excessive, redundant, or otherwise unnecessary" hours expended through across-the-board percentage deductions). To be sure, Plaintiffs certainly succeeded in obtaining some measure of relief for Investcorp's discovery misconduct—namely, the striking of trial testimony and reasonable fees and expenses incurred in connection with litigating the discovery dispute. But Plaintiffs failed to obtain the crux of their requested relief—an adverse inference from Investcorp's untimely production of the Minutes. <u>See</u> <u>Kortright Capital Partners</u>, 330 F.R.D. at 139.

Even setting aside Plaintiffs' limited success on the merits, the time records

reflect meetings and teleconferences attended by every attorney as well as entries for observing

oral argument and trial.  See Mazzei v. Money Store, 2015 WL 2129675, at *4 (S.D.N.Y. May 6,

2015) (reiterating the propriety of "across-the-board percentage reductions . . . where a case is

overstaffed, 'resulting in needless duplication of work and retention of unnecessary personnel.'"

(citation omitted)).  Similarly, the time records reveal instances of vague and generalized

descriptions of work, such as "attention to" various issues.  See Themis Capital, 2014 WL

4379100, at *6-7 (collecting cases and applying across-the-board reduction to account for

staffing inefficiencies and vague time entries); see also H.B. Auto. Grp., 2018 WL 4017698, at

*12 (surveying percentage reductions between 15% and 30% "to account for block billing, vague

time records, and the resulting inability of the Court to assess the reasonableness of counsel's

hours").

Finally, in view of the relatively straightforward issues presented by this mine-run

discovery dispute, 340.46 hours billed by seven attorneys over a one-month span is excessive.

Accord Mazzei, 2015 WL 2129675, at *4 (approving a 20% reduction based on the "relative

simplicity" of a discovery dispute concerning the spoliation of evidence and "the brief period

during which this dispute was ongoing").  In view of Plaintiffs' limited success in litigating this

discovery dispute, occasional staffing inefficiencies and billing deficiencies, and the inordinate

amount of time devoted to this issue, a 15% across-the-board reduction to the amended lodestar

is justified, yielding a final lodestar figure of $223,256.32.  Because this Court discerns no

special circumstances that warrant departing from the final lodestar figure, see Perdue, 559 U.S.

at 553, Plaintiffs are awarded $223,256.32 in attorney's fees.

CONCLUSION

The failure of the Man transaction to close in June 2016 cost Plaintiffs a lucrative opportunity to partner with one of the world's largest asset managers. What the trial evidence shows is that despite representing its intent to participate in the Man transaction in April 2016, Investcorp changed its mind at the last moment. Of course, the evidence also demonstrates that Investcorp was not forthright with Plaintiffs about the reason for its change of heart, and that Investcorp's internal decision-making was haphazard. Moreover, Investcorp's subsequent actions to cover up the lie—at worst—arguably bespeak some knowledge that it did not do right by Plaintiffs. But whether Investcorp's post–April 2016 conduct renders it liable to Plaintiffs was not at issue in this trial. Rather, the dispositive question undergirding Plaintiffs' remaining cause of action is whether Investcorp misrepresented its desire and intent to participate in the Man transaction at the time it made those statements in April 2016. Considering the evidence as a whole, this Court concludes that the answer to that question is no. As the New York Court of Appeals explained almost a century ago,

> [a]lthough a false representation as to a state of mind[] may be a false representation of a material fact, it does not follow that every broken promise acted upon is actionable. . . . Disappointed hopes are not the basis of legal liability. If they were, no one, without making himself liable for damages, could innocently and in good faith say that he would advance money in aid of an embarrassed enterprise and then change his mind when it developed that the situation was not as rose colored as good[-]natured optimism had pictured it when the promise was made.

Adams v. Clark, 146 N.E. 642, 644 (N.Y. 1925) (internal citations omitted).

For the foregoing reasons, Plaintiffs have not proven their negligent misrepresentation claim by a preponderance of the evidence. The Clerk of Court is directed to enter judgment in favor of Investcorp dismissing Kortright's negligent misrepresentation claim. The judgment shall reflect Plaintiffs' entitlement to $223,256.32 in attorney's fees for Investcorp's discovery misconduct. The Clerk of Court is further directed to terminate the

motion pending at ECF No. 182 and mark this case as closed.

Dated: August 7, 2019
New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.